GENERAL COMMUNICATIONS ENGI-
NEERING, INC., Plaintiff,

v.

MOTOROLA COMMUNICATIONS AND
ELECTRONICS, INC., Defendant.

No. C–74–0810 RFP.

United States District Court,
N. D. California.

June 30, 1976.

Blair M. White, Ralph M. Segura, White, Segura & Beserra, Oakland, Cal., for plaintiff.

Donald G. Kempf, Jr., Garrett B. Johnson, Kirkland & Ellis, Chicago, Ill., for defendant; Robert N. Lowry, Brobeck, Phleger & Harrison, San Francisco, Cal., of counsel.

PECKHAM, Chief Judge.

This is an action brought by plaintiff General Communications Engineering, Inc.

(hereafter "G.C.E.") against defendant Motorola Communications and Electronics, Inc. (hereafter "Motorola") alleging violations of section 2 of the Sherman Act, 15 U.S.C. § 2, the California Cartwright Act (Business & Profession Code §§ 16750 et seq.), and § 3369 of the California Civil Code and other related provisions of California law. The gravamen of the complaint is Motorola's deliberate use of alleged unfair trade practices pursuant to a plan to monopolize the market for private two-way radio communications equipment in California and throughout the United States. The alleged unfair trade practices which plaintiff complains of consists of Motorola contacting customers and potential customers of plaintiff and attempting to convince them to do business with Motorola. In so doing, the complaint alleges that Motorola disparages the quality of plaintiff's equipment and service. The complaint also alleges that defendant deliberately attempts to induce plaintiff's customers to break existing contracts with plaintiff and otherwise unjusti-fiably interferes with plaintiff's contractual relations. Plaintiff also accuses the defendant of underbidding on contracts for the provision of private two-way radio communications equipment, many times selling the equipment at less than cost and at such a price that plaintiff can not possibly compete. However, aside from these general allegations of unfair conduct, the only specific example of Motorola's conduct that plaintiff complains of concerns defendant's dealings with Kaiser Sand & Gravel, a large buyer of plaintiff's private two-way radio communications equipment.[1] For defendant's conduct in this incident and other similar incidents, not specified in the complaint, plaintiff seeks recovery of $15 million in damages[2] plus various forms of injunctive relief.

Defendant's motion for summary judgment is presently before the court. It is adequately supported by depositions and affidavits that completely refute the allegations in the complaint with respect to Kaiser Sand & Gravel Co.,[3] as well as a number

---

1. The complaint alleges:

    12. On [or about April 5, 1974] defendant's agent . . . informed Kaiser Sand & Gravel that it should cease doing business with plaintiff and commence doing business with defendant and purchase the equipment needed for Kaiser's private two-way communications . . . .

    13. In order to persuade Kaiser Sand & Gravel to do so, the defendant's agent . . . falsely and maliciously informed Kaiser Sand & Gravel Co. that plaintiff had failed to properly perform certain acts that were needed for Kaiser Cement to properly use the private two-way radio communications equipment it had purchased from plaintiff, including the securing of proper license from the F.C.C.

    14. At the time that the defendant's agent . . . made the above statement, he knew it to be false and untrue, and he did it for the purpose of inducing Kaiser Sand & Gravel Co. to cease doing business with plaintiff and commence doing business with defendant.

    15. In so doing, the defendant's agent . . knew that Kaiser Sand & Gravel Co. would be greatly concerned with any problems with F.C.C. licenses and if it accepted them as true, it would be induced to cease doing business with plaintiff and commence doing business with defendant.

    16. This action . . . is just the latest instance of unfair actions that the defendant has taken in its attempt to drive the plaintiff out of the business of providing private communications equipment and to monopolize the provision of the private two-way radio communications equipment to private industries and government agencies.

2. Count I seeks $2 million in damages to be trebled for violations of § 2 of the Sherman Act ($6 million); count II seeks $2 million in damages to be trebled for violations of the California Cartwright Act ($6 million); and count III seeks $2 million of actual damages and $1 million in punitive damages for violation of other state laws.

3. In contrast to the allegations in plaintiff's complaint, see note 1 supra, the Deposition of Michael Lucero (docket # 126), Kaiser's Manager of Purchasing reveals that:

    (1) Far from being false and malicious, the information provided Kaiser by Motorola concerning the deficiencies in the Kaiser FCC license application prepared by G.C.E. was true and accurate;

    (2) the deficiencies in Kaiser's applications in fact led the FCC to reject them;

    (3) no disparaging comments of any kind were ever made to Kaiser by anyone from Motorola; and

of other instances of Motorola's purported wrongdoing, which plaintiff raised during discovery.[4] In response, plaintiff has submitted literally hundreds upon hundreds of affidavits and statements from all over the country[5] in an effort to withstand defendant's summary judgment motion. The major question to be decided here is whether plaintiff's efforts were successful.

## THE STANDARDS FOR SUMMARY JUDGMENT

In dealing with the propriety of granting a summary judgment motion, this court starts with the proposition that summary judgment is only available if there are no genuine issues of material fact to be resolved at trial, and the moving party is entitled to judgment as a matter of law. If under any reasonable construction of the evidence and any acceptable theory of law, the nonmoving party would be entitled to prevail, a summary judgment against him cannot be entered. *Industrial Building Materials Inc. v. Interchemical Corp.,* 437 F.2d 1336, 1340 (9th Cir. 1970). It is not enough, however, for the party opposing the motion for summary judgment merely to point to disputes of fact. *Bushie v. Stenocord Corp.,* 460 F.2d 116, 119 (9th Cir. 1972). "The showing of a 'genuine issue for trial' is predicated upon the existence of a legal theory which remains viable under the asserted versions of the facts, and which would entitle the party opposing the motion (assuming his version to be true) to a judgment as a matter of law." *McGuire v. Columbia Broadcasting System,* 399 F.2d 902, 905 (9th Cir. 1968).

Applying these standards to defendant's motion, this court, for the reasons that follow, is of the opinion that defendant is entitled to summary judgment with respect to counts I and II of the complaint, but not with respect to count III.

## A. *Material Facts in Dispute*

Defendant contends that its supporting papers clearly show no material facts to be in dispute. It notes that in the majority of instances in which plaintiff contends Motorola engaged in unfair trade practices pursuant to a plan to monopolize, the record is uncontradicted that plaintiff was nevertheless able to retain or secure the business of the customer in question. Thus, defendant argues that with regard to those incidents, there is no need to refute plaintiff's factual allegations since they are not legally sufficient to support the complaint, plaintiff not having suffered any injury from them. Defendant further argues that in any event its supporting papers clearly show that it did not engage in any unfair practices. We have some quarrel with both of these arguments.

With regard to defendant's first argument, the mere fact that plaintiff did not lose a particular customer because of defendant's alleged unfair trade practices does not conclusively establish that it suffered no injury. Plaintiff, in fact, strenuously contends that defendant's unfair practices forced plaintiff to devote additional time, money, and effort to secure the business that it obtained, and that such resources could have otherwise been channeled towards obtaining new business. *Cf. Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359

(4) no suggestion was made that Kaiser should cease doing business with G.C.E.

4. For example, with regard to incidents involving Wellsco Data, Delta Truck Lines, Avis-Rent-A-Car, Bus Express Service, and General Mills, the record is uncontradicted that Motorola did not engage in any unfair trade practices and was not responsible in any untoward manner for G.C.E.'s loss of those companies' business. See Deposition of Ron Forney (docket # 57); Deposition of William Bacigalupi (docket # 53); Deposition of Robert Roemer (docket

# 64); Deposition of Jim Oates (docket # 56); Deposition of Dale Garret (docket # 48).

5. Many of these statements, either in whole or in part, recite multiple hearsay as to what Motorola salesmen told plaintiff's customers or other Motorola competitors, recount acts and statements of Motorola relating to different competitors of Motorola in different parts of the country with different primary lines of business from the plaintiff, or otherwise fail to conform with the requirements of rule 56(e) of the Federal Rules of Civil Procedure.

(1973); *California Motor Transport Co. v. Trucking Limited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Thus, assuming that defendant's practices are indeed unfair,[6] the injury alleged appears to be cognizable. Accordingly, this court will consider all instances in which plaintiff alleges that Motorola engaged in unfair trade practices regardless of whether those practices resulted in the loss of the particular customer to whom they were directed.[7] As to defendant's second argument, this court is of the opinion that plaintiff has managed to raise material questions of fact with respect to at least the following eleven instances in which it contends that Motorola disparaged its product or service, or otherwise competed unfairly against it.

1. *Ted Peters Trucking Co.* Plaintiff claims that Ted Peters Trucking Co. ("Peters") decided not to buy communications equipment from G.C.E. because of false and untrue information given to Peters by Motorola. Defendant disputes that claim and contends that Peters did not buy any two-way radio equipment because it was not in the financial position to do so. Both parties rely on the deposition of Gary Theo Peters, Dispatching and Operations Manager of Peter's Trucking Company.

From the deposition, it appears that Peters had requested proposals from R.C.A., Motorola and G.C.E. and had some preliminary discussions with General Electric about supplying it with private two-way radio equipment. Mr. Peters testified that all the companies stressed their products and gave him conflicting opinions on which "type" of repeater coverage would be most suitable for his company. He testified that Motorola's salesman, Frank Grimes, with whom he principally dealt, had not made any specific statements disparaging G.C.E. but rather had made a general sales pitch stressing Motorola's products; however, it appears that on one occasion a salesman who accompanied Mr. Grimes made some comments from which Mr. Peters "inferred" that plaintiff's radio was not a "proven radio," "that it hadn't been on the market that long," and that it "possibly could be . . . a cheap radio." Mr. Peters further testified that none of the comments from anyone at Motorola influenced his decision not to purchase radio equipment from G.C.E. Rather, he indicated that he was generally confused at the differences in the price, quality and type of repeater coverage offered in each of the various systems, and that by the time he was ready to. choose among the offers, he was no longer in a financial position to purchase from anyone. Nevertheless, drawing all possible inferences in favor of the plaintiff, this court is not prepared to say that plaintiff has not raised a material question of fact as to whether Motorola disparaged plaintiff's product in this instance.

2. *Anderson Electric.* Plaintiff claims that G.C.E. failed to secure the business of Anderson Electric because of disparaging remarks made by Motorola. Defendant relies on the deposition of William Anderson, owner of Anderson Electric, in which Anderson states that no one from Motorola ever made any disparaging remarks about G.C.E.'s products or service and that the company finally decided to rent radio telephones from an entirely different source because of the low price it received. Nevertheless, plaintiff relies on the affidavit of its General Sales Manager, Mark Dunaway, who swears that he was physically present and heard Motorola salesmen

---

**6.** Of course, if defendant's practices were merely competitive and not unfair, the fact that plaintiff would have to devote more time to obtaining sales would not constitute an actionable injury.

**7.** However, to the extent that plaintiff contends the unfair practice of Motorola consisted of inducing plaintiff's customers to breach existing contracts with the plaintiff, the fact that the contract was not breached would prevent this particular business tort from being actionable. *See e. g., Charles C. Chapman Building Co. v. California Mart,* 2 Cal.App.3d 846, 853, 82 Cal. Rptr. 830, 834 (2d Dist. 1969). However, such conduct could be actionable as unjustifiable interference with advantageous business relations. *Id.* at 855, 82 Cal.Rptr. at 836.

state that G.C.E.'s coverage maps were incorrect; that plaintiff did not have the technical support of a large corporation and could not make delivery on time; and that the equipment G.C.E. was suggesting was a Japanese radio of poor resale quality which was hard to maintain. Thus, the question of whether Motorola disparaged G.C.E.'s product to Anderson Electric in the manner claimed by plaintiff is a material question of fact to be resolved at trial.

■ 3. *Electronic Dispensers Int'l.* Plaintiff claims that Motorola made disparaging remarks to Wayne Easley of Electronic Dispensers Int'l (EDI) concerning the quality of the communications equipment which G.C.E. proposed to sell EDI, and that as a result EDI purchased the equipment it needed from Motorola rather than G.C.E. Defendant offers the deposition of Mr. Easley in which he states that Motorola never made any disparaging remarks about G.C.E. or about its personnel, services, or products. Mr. Easley further testified that EDI's choice of Motorola over G.C.E. had been based on "repeater sites, cost of total package and features of the equipment." However, plaintiff has submitted the affidavit of Mark Dunaway, General Sales Manager of G.C.E., in which he states that Mr. Easley told him that he [Easley] was purchasing Motorola radios because Motorola could supply him with a frequency on Mt. Diablo that no one else in the Bay Area could supply him with and that Motorola suggested that the radio proposed by G.C.E. was of inferior quality. Although this prior inconsistent statement of Mr. Easley, not having been made under oath, is not admissible for proof of the facts asserted, *see* rule 801(d)(1)(A) of the Federal Rules of Evidence, it is admissible for the limited pur-

pose of impeaching Mr. Easley's deposition statement. Thus, it is sufficient to raise a material question of fact as to Motorola's alleged unfair actions with respect to EDI.[8]

4. *The Center for Independent Living.* Plaintiff's affidavit by Jan McEwen, Communications Manager for The Center for Independent Living, states that she was called by a Motorola salesman who, after being informed that she had made an order with G.C.E., suggested that he could make her a better deal and asked to make a bid. Ms. McEwen replied that Motorola could make a bid, but that she would not break the contract as that was "dirty pool." Ms. McEwen states that the Motorola salesman responded by saying "it's good business to break it if you can get something cheaper." The affidavit also asserts that the Motorola salesman claimed that G.C.E. did not have good repeaters.[9]

5. *Speedy Gonzales.* The affidavit of Ken Cisne, Dispatcher and President of Speedy Gonzales Inc., states that shortly after purchasing radio equipment from G.C.E. and filing a license application with the F.C.C., his company was visited by a Motorola salesman who stated that if the company cancelled its order with G.C.E., it could obtain better equipment and faster service from Motorola. The salesman also stated that the Johnson Equipment that was being purchased from G.C.E. was inferior and would not serve the company's purposes. Mr. Cisne also remembers at least three other similar visits of Motorola salesmen and states that on each occasion he was informed that he should break his contract with G.C.E. and buy Motorola equipment. Mr. Cisne states that as a result of these meetings he became confused and needed further assurances from G.C.E. before deciding to retain his order. He did,

---

**8.** While this court notes that depositions are genuinely more trustworthy than affidavits, and that the factfinder is more likely to believe the statements of an impartial witness than an interested one, we are unwilling to depart from the general rule that questions of credibility are sufficient to raise material questions of fact for purposes of rule 56. See 6 Moore's Federal Practice, ¶ 56.15[4] (2d Ed. 1976).

**9.** The affiant's account of this incident is slightly different at deposition (*compare* docket # 96(a) *with* docket # 145); but for purposes of this motion, the court will draw all inferences in favor of the plaintiff wherever possible.

however, cancel two "Johnson hand held units" from a prior order.[10]

6. *Denalect Alarm System.* The affidavit of Rodney Uffindell, owner of Denalect Alarm System, states that he was contacted by a Motorola salesman who urged Mr. Uffindell to "junk" the F.C.C. license application that G.C.E. had made on behalf of Denalect in conjunction with the sale of some used equipment so that Denalect could obtain a less-crowded frequency from Motorola.[11]

7. *Medi-Rents.* Chris Cuyler of Medi-Rents of Oakland, California, states in his affidavit that a Motorola salesman called on him after seeing an F.C.C. license application filed by G.C.E. on behalf of Medi-Rents. Mr. Cuyler states that the Motorola salesman attempted to convince him to purchase Motorola equipment by claiming "that the lines of communication frequencies that Motorola could furnish were better than the ones General Communications was giving to us." According to Mr. Cuyler, Motorola "kept bad-mouthing the fact that General Communications' lines were very crowded and that theirs weren't." [12]

8. *Warren Transportation.* The affidavit of Barney Bloat, Head Salesman and Communication Manager for Warren Transportation, states that after having chosen to buy G.C.E. equipment rather than Motorola equipment, a Motorola salesman contacted him about purchasing equipment from Motorola on several occasions and that on one occasion a Motorola salesman appeared in person to demonstrate that the frequency on which Warren had been licensed by G.C.E. was an extremely crowded frequency. Mr. Bloat further states that the salesman told him on numerous occasions that if he would cancel his contract with G.C.E., Motorola could get him a less crowded frequency.[13]

9. *Kennedy Company.* The affidavit of Thomas Kennedy, President of Kennedy Company, states that after entering into an agreement with G.C.E. for purposes of providing a two-way radio mobile communications system, he was contacted by a Motorola salesman who "asked him to cancel [his] contract with General Communications Engineering Inc. and purchase a system from Motorola." [14]

10. *Eller Outdoor Advertising.* The depositions of Mr. Keith Long, Director of Operations of Eller, and Mr. Don Mann, a Motorola salesman, reveal that some months after Eller had decided to buy radio equipment from G.C.E. rather than from Motorola, Mann called Long and told him that after speaking to the F.C.C. he learned that Eller's license application had not been filed and thus was wondering whether Eller had changed its mind and whether it would

10. These statements (docket # 72(b)) are inconsistent with those contained in the affidavit of Motorola salesman Steven Muir (docket # 103(a)); however, for the purposes of this motion we must accept Mr. Cisne's version as true.

11. The statements in this affidavit (docket # 95) are contradicted by those of the affidavit of Motorola salesman Frank Kerba (docket # 103(b)), who indicates that there was no suggestion that Denalect break any agreement; however, for purposes of this motion, the court will assume plaintiff's version of the facts are correct.

12. These statements (docket # 85(b)) are somewhat inconsistent with the affidavit of Motorola salesman Tuthill (docket # 103(d)) and with a later deposition of Mr. Cuyler (docket # 150). However, for purposes of this motion, we will draw all inferences in favor of plaintiff wherever possible.

13. The statements contained in Mr. Bloat's affidavit (docket # 41(a)) are contradicted by statements he made in a subsequent deposition (docket # 151) and by the affidavit of Motorola salesman Bronson (docket # 103(c)), which Bloat supports at his deposition. Nevertheless, for purposes of this motion all inferences will be drawn in favor of plaintiff wherever possible.

14. This statement (docket # 33(a)) is contradicted in a later deposition of Mr. Kennedy (docket # 144) when he testifies that he cannot recall any request that he break contractual relationships with G.C.E. However, for purposes of this motion, we will draw all inferences in favor of plaintiff wherever possible.

be interested in buying from Motorola. Long responded that Eller had not changed its mind but that it was concerned that no license had been filed. Mann left a number of the F.C.C. that Long could call to check on the license.

Mann called several more times to inform Long that the license had not been filed. On one of the occasions, Long testified that Mann said that Motorola would have done a better job getting the application processed and that this was the way G.C.E. operated —"they hold up on licensing when they can't get equipment."[15]

Subsequently, Mann learned that on one occasion when he had called Long to advise him that the license had not been filed, the license had in fact been filed. Mann then communicated that information to Long.

11. *Panoply Patrol.* The affidavit of Howard George, owner and manager of Panoply Patrol states that after entering into an agreement to purchase two-way radio equipment from plaintiff and submitting a license application to the F.C.C., he was contacted by a Motorola salesman. The salesman stated that he had reviewed the license application filed before the F.C.C. and had determined that Motorola had someone on the same frequency in Santa Rosa and wanted to assure that there would be no overlap and interference with his customer. In so doing, the salesman informed Mr. George that Motorola had equipment that would work out better than the equipment ordered from G.C.E. in that it had tone control and would not create cross-interference. The salesman stated that Motorola equipment was superior to the G.C.E. equipment and that he [the salesman] thought that Panoply would be better off not using equipment from G.C.E. and that he should consider purchasing from Motorola.[16]

The foregoing descriptions essentially constitute all the major instances in which material questions of fact exist as to whether the defendant utilized unfair trade practices pursuant to its alleged attempt to monopolize the private two-way communications market.[17] They have been set forth in some detail because they comprise the

---

15. Mann's deposition (docket # 64) contradicts this part of Long's testimony (docket # 71); however, for purposes of this motion, we assume that plaintiff's version of the facts is correct.

16. At deposition (docket # 143), Mr. George testified that there was no specific request for him to break a contract and no disparagement of G.C.E.'s goods and services. (Compare docket # 105(b).) However, for purposes of this motion, the court will draw all inferences in favor of the plaintiff wherever possible.

17. Also somewhat relevant are the statements of some of Motorola's other competitors and the deposition of Mr. Ernest Luckhardt, a former Motorola sales manager, which together indicate that it is a standard Motorola practice to inspect F.C.C. licenses and applications in order to find out which businesses are considering the purchase of radio equipment and then to approach those businesses and to try to sell them Motorola equipment. However, given the voluminous record before us, this court neither has the space or inclination to catalogue every factual question which would have to be proved at trial. Examples of the type of factual questions which, though established, and arguably relevant to this motion, this court nevertheless chose not to report are plaintiff's charges that when plaintiff informed Motorola of the existence of radio interference between plaintiff's customers and Motorola's customers, Motorola waited some period of time before taking steps to correct the problem. *See e. g.,* Affidavit of Bill Rippee (docket # 38(b)).

To be sure, the record also reflects many instances in which plaintiff's assertions were completely unsupported by admissible evidence or completely contradicted by the supporting papers of the defendant. For example, the depositions of Messrs. Corbin (docket # 52) and Dunaway (docket # 50) of G.C.E. contain at least 15 allegations of further unfair practices of Motorola of which there is no evidence except for the hearsay statements which those G.C.E. officials report in their depositions. *See also* note 4 *supra.* Especially noteworthy is plaintiff's failure to submit any evidence to substantiate its allegation that defendant engaged in predatory pricing. Significantly, plaintiff has not responded to defendant's assertion that plaintiff has completely abandoned its predatory pricing allegation, and plaintiff's closing brief, which lists the material facts that it has shown to be in dispute, fails to mention defendant's practice of predatory pricing or any supposed Robinson-Patman violations that it had previously claimed the defendant engaged in. *See also* note 26 *infra.*

background against which the viability of plaintiff's legal theories are to be tested.

## B. The Viability of Plaintiff's Legal Theories

1. *Section 2 of the Sherman Act—Attempt to Monopolize.* Section 2 of the Sherman Act enumerates three offenses— monopolization, attempt to monopolize, and conspiracy to monopolize.[18] While the first and third of these offenses have been the subject of relatively definitive judicial explanation,[19] attempt to monopolize has frequently been treated in dicta found in cases decided upon monopolization or conspiracy grounds[20] and is frequently acknowledged by both courts[21] and commentators[22] to be an elusive concept difficult of precise definition.

The standard judicial formulation of section 2's attempt prohibition is Justice Holmes' famous passage in *Swift & Co. v. United States,* 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905):

Intent is . . . essential to . . an attempt [to monopolize]. Where acts are not sufficient in themselves to produce a result which the law seeks to prevent—for instance, the monopoly—but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. . . . But when that intent and the consequent dangerous probability exist, this statute, like many and like the common law in some cases, directs itself against that dangerous probability as well as the completed result. [*Id.* at 396, 25 S.Ct. at 279.]

Interpreting this language, courts have divided on the question of whether intent and dangerous probability are separate and dual requirements of attempt or whether only intent need be shown since the probability is its consequence. Related questions are the extent to which proof of intent to monopolize a "relevant market" and defendants "market power" must be demonstrated.[23] Even within this circuit, it is difficult to obtain a clear picture of the

**18.** "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of [interstate commerce] shall be deemed guilty of a misdemeanor . . . ." 15 U.S.C. § 2.

**19.** For monopolization, see e. g., *United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. E. I. duPont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264. For conspiracy, see e. g., *United States v. Consolidated Laundries Corp.,* 291 F.2d 563 (2d Cir. 1961).

**20.** See e. g., *Walker Process Equipment Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *United States v. E. I. duPont de Nemours & Co.,* 351 U.S. 377, 395 n. 23, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *Industrial Building Materials Inc. v. Interchemical Corp.,* 437 F.2d 1336 (9th Cir. 1970); *Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9th Cir.) *reh. denied* per curiam 327 F.2d 478 (9th Cir.) *cert. denied* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964); *Power Replacements Corp. v. Air Preheater Co., Inc.,* 356 F.Supp. 872 (E.D.Pa.1973).

**21.** *See e. g., Dobbins v. Kawasaki Motors Corp.,* 362 F.Supp. 54; 59–60 (D.Ore.1973).

**22.** See e. g., P. Areeda, Antitrust Analysis— Problems, Text, Cases, p. 241 (2d Ed. 1974); Cooper, "Attempts and Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of Section 2," 72 Mich.L.Rev. 375 (1974); Note, Attempt to Monopolize Under the Sherman Act; Defendants Market Power as a Requisite to a Prima Facie Case, 73 Col.L. Rev. 1452 (1973).

**23.** The Supreme Court has not as yet reconciled the conflicting views of the circuits on these issues. *Compare Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9th Cir.) *reh. denied* per curiam 327 F.2d 478, *cert. denied* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964); *Union Carbide & Carbon Corp. v. Nisley,* 300 F.2d 561, 585 (10th Cir. 1961) *with Bernard Food Industries Inc. v. Diente Co.,* 415 F.2d 1279, 1284 (7th Cir. 1969) and *Whitten Inc. v. Paddock Pool Builders,* 508 F.2d 547, 550 (1st Cir. 1974); *Acme Precision Products Inc. v. American Alloys Corp.,* 484 F.2d 1237, 1240 (8th Cir. 1973); *Cliff Food Stores Inc. v. Kroger Inc.,* 417 F.2d 203, 207 (5th Cir. 1969); *American Football League v. National Football League,* 205 F.Supp. 60 (D.Md.1962) *aff'd* 323 F.2d 124 (4th Cir. 1963).

elements needed to establish a claim of attempted monopolization under section 2.

The primary source of confusion stems from *Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9th Cir.) *reh. denied* per curiam 327 F.2d 478, *cert. denied* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964), brought by a gas station operator against his supplier when his franchise was cancelled. Ordering a new trial because of erroneous jury instructions, the court found sufficient evidence to support findings that Tidewater had violated section 1 of the Sherman Act and section 3 of the Clayton Act by fixing retail gasoline prices, and by "tying" an obligation to purchase tires, batteries and accessories to the lease of the station and the sale of petroleum products. In addition, the court ruled that the same conduct should be submitted to the jury with instructions on attempt to monopolize, explicitly rejecting any requirement that the plaintiff show a relevant market or dangerous probability of attaining monopoly power. 327 F.2d at 474. Rather, relying on the reference to intent and the "consequent dangerous probabiiity" of success in the *Swift* opinion, the court concluded that specific intent to monopolize is the only evidence of dangerous probability required by the statute. 327 F.2d at 474–475.

In 1970, despite Supreme Court dictum implicitly disapproving this formulation,[24] *Lessig* was reaffirmed in *Industrial Bldg. Materials Inc. v. Interchemical Corp.,* 437 F.2d 1336 (9th Cir. 1970), the court holding that "[i]n an attempt to monopolize situation only intent to monopolize is in issue and no proof as to relevant market is required." *Id.* at 1344. However, subsequent Ninth Circuit decisions appear to have abandoned at least part of the *Lessig* doctrine.

In *Cornwell Quality Tools Co. v. C. T. S. Company,* 446 F.2d 825 (9th Cir. 1971) *cert.*

*denied* 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972), Judge Hufstedler indicated in dicta that the elements of an attempt to monopolize violation were (1) specific intent to monopolize and (2) sufficient market power to come dangerously close to success, citing *Swift & Co. v. United States,* 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905).

In *Bushie v. Stenocord,* 460 F.2d 116 (9 Cir. 1972), the court again indicated that dangerous probability of success was an element of an attempt to monopolize case, explaining that the *Lessig* and *Industrial Building Materials* holdings that only specific intent was required were based upon substantial restraints of trade in violation of section 1, which were apparently themselves sufficient evidence of both specific intent and dangerous probability of success. *Id.* at 121. *See Dobbins v. Kawasaki Motors Corp.,* 362 F.Supp. 54, 60 (D.Ore.1973).

Subsequently in *Moore v. Jas. H. Mathews & Co.,* 9 Cir., 473 F.2d 328, Judge Hufstedler appeared to retract part of her statement in *Cornwell,* writing that "an attempt to monopolize under section 2 does not require proof of monopoly power. Proof that there is a 'dangerous probability of success' is certainly enough. . . . Evidence of market power is relevant, but not indispensable to a *Lessig* claim." *Id.* at 332.

Finally, the court in *Hallmark Industry v. Reynolds Metals Co.,* 489 F.2d 8 (9th Cir. 1973), confirmed the views expressed in *Bushie* and *Moore,* noting that while "[t]he *Cornwell* dictum [could not] be read to require proof of any particular degree of market power as an independent and necessary element of attempt to monopolize . . ." (489 F.2d at 12 n. 3), market power was by no means irrelevant to the issue:

Certainly market power may establish dangerous probability. However . .

24. In *Walker Process Equipment Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965) the court wrote:

"To establish monopolization of attempt to monopolize a part of trade or commerce under section 2 of the Sherman Act, it would then be

necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved. Without a definition of that market there is no way to measure Food Machinery's ability to lessen or destroy competition." 382 U.S. at 177, 86 S.Ct. at 350.

dangerous probability may also be shown through proof of specific intent to set prices or exclude competition in a portion of the market without legitimate business purpose. This specific intent must be accompanied by predatory conduct directed to accomplishing the unlawful purpose. Ordinarily specific intent is difficult to prove and will be inferred from such anticompetitive conduct. Therefore, evidence of market power may be relevant, but it is not indispensable where a substantial claim of restraint of trade is made.

489 F.2d at 12, 13.

■ Thus, extrapolating from these decisions it appears that in this circuit the elements needed to establish a claim of attempted monopolization are (1) a specific intent to monopolize and (2) a dangerous probability of success, this latter requirement being satisfied by a showing of either a significant amount of market power or by proof of a substantial restraint of trade in violation of section 1 of the Sherman Act. See *Jack Winter Inc. v. Koratron Inc.*, 375 F.Supp. 1 (N.D.Cal.1974); *Dobbins v. Kawasaki Motors Corp., supra.* The acts which satisfy the "specific intent" requirement, however, deserve further attention.

■ A firm has monopolized when it has obtained "monopoly power"—the power to control prices or exclude competition. *United States v. E. I. duPont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264. It follows then that a specific intent to monopolize would be the specific intent to acquire power to control prices or exclude competition.

■ Yet, the mere intention to exclude competition is not sufficient to show a specific intent to monopolize. The very nature of unfettered competition is exclusionary to the extent that making a sale and increasing an available share of business is its object. Were all that were required by the specific intent requirement an intent to prevail generally in the market, the very competitive behavior that the antitrust laws were intended to protect, would instead be prohibited. Accordingly, the specific intent to monopolize must be construed as a specific intent to prevail in the market by some untoward means. See *Hallmark Industries, supra,* 489 F.2d at 12–13; *Cooper, supra* note 22 at 395. Thus, determining whether a firm has a specific intent to monopolize may, in reality, only involve a judicial evaluation of a firm's behavior as competitive or anticompetitive. See *Cooper, supra* at 382–398. Yet, again, not every type of anticompetitive act will show the requisite specific intent to monopolize. *See Apex Hosiery Co. v. Leader,* 310 U.S. 469, 512, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); *Tower Tire & Auto Ctr. Inc. v. Atlantic Richfield Co.,* 392 F.Supp. 1098, 1106 (S.D.Texas 1975). The acts from which one can infer specific intent must be essentially predatory in nature.[25] *Knutson v. Daily Review,* 383 F.Supp. 1346, 1372–1375 (N.D.Cal.1974).

Hence, it is with this understanding that we turn to the question of whether, accepting plaintiff's version of the facts as true, it would be entitled to judgment as a matter of law on its attempt to monopolize claim.

■ a. *Specific intent to monopolize.* Plaintiff contends that defendant's intent to monopolize may be inferred from its unfair practices of disparaging plaintiff's product and service and from suggesting that certain customers breach existing commitments with plaintiff so that they can

---

**25.** It also appears that an inference of specific intent to monopolize does not have to be made with regard to a particular relevant market. In *Lessig,* the court held that since section 2 prohibits attempts to monopolize "any part" of interstate commerce, the relevant market was not in issue. 327 F.2d at 474. *See also United States v. Yellow Cab,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). This part of the *Lessig* holding, although rarely followed in other jurisdictions, *see* note 23 *supra,* still appears to be the law in this jurisdiction. Thus, in an attempt to monopolize action, the determination of a relevant market becomes necessary only when it is essential to prove a defendant's dangerous probability of success by a showing of market power.

instead deal with defendants.[26] However, these are not the type of essentially predatory acts from which courts normally infer a specific intent to monopolize. *Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951) and *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), relied on by plaintiff, both involved practices which had no economic or competitive utility and which could have had no other aim other than to sabotage the efforts of their competitors and potential competitors.

In *Lorain Journal,* the Journal was the only newspaper in Lorain and had an almost complete monopoly on the mass dissemination of news and advertising in the area. When a radio station became licensed to operate some eight miles away in neighboring Elyria, the Journal forced its customers to boycott the competing radio station by refusing to take advertising from anyone who advertised on the radio station. Similarly, in *Otter Tail,* the utility sold electric power at retail in 465 towns in Minnesota, North Dakota, and South Dakota, and had control of the only available transmission lines. The only potential competition to Otter Tail's control of the retail electricity market came from towns that desired to develop municipal electric systems. In order to do this, however, the municipalities needed to purchase electric power at wholesale and needed access to Otter Tail's transmission lines. Otter Tail refused to sell these municipalities energy at wholesale and would not agree to "wheel" power from other suppliers of wholesale energy. Moreover, where by chance a municipality was able to obtain an alternate source of power, Otter Tail would immediately institute litigation which would result in delaying the issuance of the revenue bonds needed to finance the systems. Accordingly, in each of these cases, the court had little trouble in inferring the requisite specific intent to monopolize as the defendant's conduct was unmistakably undesirable.[27]

In contrast, the practices attacked here bear a striking similarity to the way a competitive firm would ordinarily behave— making product and service comparisons and actively soliciting new customers by showing them the advantages that they could obtain from dealing with it rather than another competitor. The line between such competitive behavior and the type of unfair behavior that defendant is charged with is a thin one indeed. Accordingly, courts should proceed very cautiously when asked to infer an intent to monopolize on the part of firms that are alleged only to have crossed that line. *See generally Cooper, supra* note 22 at 435–452. Nevertheless, plaintiff points to cases in which some courts have inferred an intent to monopolize from the type of behavior that plaintiff charges Motorola with engaging in here.

**26.** The complaint also alleges that defendant engaged in predatory pricing on several occasions. However, the only evidence which plaintiff has submitted that even alludes to this charge are the assertions of its president Walter Corbin, that the defendant outbid plaintiff for several accounts by offering large discounts from its list price, and the affidavit of the president of Palomar Communications in Escondido, California, describing how Motorola increased its sales force in Escondido, and offered large discounts from its list price with the result that Palomar lost a large share of its business and was forced to cut prices itself.

In both these instances there is absolutely no indication that Motorola's discounts were below cost. With regard to plaintiff's claim that Motorola's conduct in Escondido violated the Robinson-Patman Act, even if true, it would not be relevant to this action as plaintiff has no standing to raise a violation of the antitrust laws that it is completely unaffected by. And while in some cases, courts have inferred an intent to monopolize from repeated violations of the Robinson-Patman Act, *see e. g., Power Replacements Corp. v. Air Preheater Co. Inc.,* 356 F.Supp. 872 (E.D.Pa.1973) the inference that could be drawn from one possible violation in a market in which plaintiff does not participate, even when considered with defendant's other alleged unfair practices, is not sufficient to show an intent to monopolize.

**27.** In addition, it was clear that there was a dangerous probability of success, both defendants in effect already possessing monopoly power.

In *Power Replacements Corp. v. Air Pre-heater Co. Inc.*, 356 F.Supp. 872 (E.D.Pa. 1973), it was held that "the disparagement of plaintiff's products is illegal under Section 2 when coupled with the power to control prices or exclude competition." *Id.* at 897. This disparagement apparently consisted of informing the customers of its only competitor that while that competitor might sometimes offer its equipment for lower prices, the customer might experience "variation in quality of materials or performance of equipment" and receive unsatisfactory service. Similarly, defendants implied that they could not meet the low prices of its competition and hope to maintain the integrity and reputation of its product.[28]

Although the type of disparagement just described resembles the type of disparagement which plaintiff complains of here, *Power Replacements* is not as persuasive authority as plaintiff would urge. In *Power Replacements,* the court had extrinsic evidence which indicated that defendant's practice of disparagement was a part of a significant "campaign" designed to limit the plaintiff's market share to a specific predetermined and profit maximizing level. In addition, the court noted numerous violations of the Robinson-Patman Act, which it

found were also committed pursuant to the plan to limit the plaintiff's market share. Furthermore, the court had evidence that the defendant had designed drawings of the equipment it manufactured and sold in a manner that was purposely calculated to handicap the plaintiff from bidding against the defendant on replacement parts. Thus, when viewed in this context, it is understandable why the *Power Replacements* court had little trouble in inferring the requisite evil intent necessary to constitute a violation under section 2.[29]

Plaintiff also seeks support from a group of cases holding that the efforts of employees to drive their former employers out of business by such means as hiring key personnel, using confidential information, raiding plaintiff's customers, and disparaging plaintiff and its product constitute per se violations of section 1 of the Sherman Act.[30] *See Atlantic Heel Co. v. Allied Heel Co.,* 284 F.2d 879, 885 (1st Cir. 1960); *Albert Pick-Barth Co. v. Mitchell Woodbury Corp.,* 57 F.2d 96 (1st Cir.) *cert. denied* 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932); *C. Albert Sauter v. Richard S. Sauter Co.,* 368 F.Supp. 501 (E.D.Pa.1973). *See also Perryton Wholesale Inc. v. Pioneer Distributor Co.,* 353 F.2d 618 (10th Cir. 1965) *cert. denied* 383 U.S. 945, 86 S.Ct.

---

**28.** The court particularly objected to this latter implication as the evidence was clear that the defendants were making 50% to 60% profit on each sale. 356 F.Supp. at 891.

**29.** In fact, it is not clear exactly what inference the court drew from defendant's unfair practices. Although there is dicta in the court's opinion to indicate that such conduct would have been sufficient to show the specific intent necessary to constitute an attempt to monopolize claim, the defendant was actually found guilty of monopolization not attempt to monopolize. Thus, defendant's disparagement and other unfair acts were technically used only to infer the willful acquisition and maintenance of monopoly power and not a specific intent to monopolize. This distinction is significant because while the two concepts are closely related, they are not identical and there are instances in which certain conduct could be found to satisfy the former requirement and not the latter. *See United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir. 1945) (holding that it is impermissible for a firm with monopo-

ly power to grow with the market thereby depriving would be entrants of the tempting invitation to fill unfilled demand.) *See also* Cooper *supra* note 22 at 389–392.

**30.** Section 1 of the Sherman Act, 15 U.S.C. § 1, reads in relevant part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

Although section 1 was clearly directed against only "concerted activity," relying on theories of "intraenterprise" conspiracies or so-called "thin" conspiracies among corporations associated in one business enterprise, many courts have permitted what appears to be single-firm competitive behavior to be litigated under section 1 of the Sherman Act. See *Whitten v. Paddock Pool Builders,* 508 F.2d 547, 557 (1st Cir. 1974) and cases cited therein.

1202, 16 L.Ed.2d 208 (1966).[31] However, in a recent opinion from the First Circuit, *Whitten v. Paddock Pool Builders,* 508 F.2d 547 (1st Cir. 1974) *cert. denied* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975), the court rejected its prior holding that unfair competitive practices accompanied by an intent to hurt a competitor constitute *per se* violations of the antitrust laws, *Id.* at 561, thereby substantially undermining the entire line of cases on which plaintiff relies. Cf. *Tower Tire & Auto Ctr. Inc. v. Atlantic Richfield Co.,* 392 F.Supp. 1098, 1106–1107 (S.D.Texas 1975).

In *Whitten,* plaintiff and defendant both manufactured and merchandized prefabricated metal recirculation systems for swimming pools constructed by public agencies. The complaint arose out of the defendant's efforts to persuade architects and engineers to use its proprietary specifications before competitive bidding procedures were undertaken. Plaintiff contended that these efforts exceeded permissible bounds and claimed that as part of its efforts, defendant made false representations about plaintiff's and its own systems' capabilities. The First Circuit ruled that while it was unwilling to say that the Sherman Act was never applicable to the range of unfair practices exhibited before it, given the district court's findings that efforts to induce architects and buyers to use a particular set of specifications was a practice common in the industry and utilized by both plaintiff and defendant, and that defendant's practice of downplaying the performance of plaintiff's system and presenting an overly favorable picture of its own system was merely "seller's talk," judgment for the defendant was proper.[32]

In the instant case, the record similarly shows that Motorola by and large has done no more than engage in customary industry practices within legitimate competitive bounds. Alfred G. Franz, Chief of the Processing Branch of the Industrial and Public Safety Facilities Division of the Safety and Special Radio Services Bureau of the Federal Communications Commission testified that General Electric, E. F. Johnson (plaintiff's own supplier of radios), and several other firms review two-way radio license applications each day to gather "marketing information and related type matters." [33] R.C.A. representative, Robert Cooper, deposed by plaintiff, testified that:

We normally condition a customer when we make a sale that this information is public information and they'll get a brochure from G.E. and ADT and everybody under the sun and a visit from competitive people out there. We normally do that at the time of sale to forewarn somebody.

.    .    .    .    .

[That is to say to l]et them know that even though they bought a system they'll have other people inquiring of them "have you purchased the equipment?" "Is there anything we can do for you?" "Call me if it doesn't work." "Call me next time around." [34]

In addition, even accepting plaintiff's version of how Motorola characterizes plaintiff's product and service when trying to sell its equipment, statements that indicate plaintiff's radio is not of the same

**31.** Plaintiff also relies on *Patterson v. United States,* 222 F. 599 (6th Cir.) *cert. denied* 238 U.S. 635, 35 S.Ct. 939, 59 L.Ed. 1499 (1915) which we find unpersuasive given the context of the instant case.

**32.** *See also Telex v. I. B. M. Corp.,* 510 F.2d 894 (10th Cir.) *cert. dismissed* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975). *Travelers Insurance Co. v. Blue Cross,* 481 F.2d 80, 84 (3d Cir. 1973); *Panotex Pipe Line Co. v. Phillips Petroleum Co.,* 457 F.2d 1279, 1287 (5th Cir.) *cert. denied* 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 86 (1972). Also underlying the court's decision was its concern that the practices complained of by plaintiff "does not feel to lawyers like the stuff of antitrust" and its observations that the law of torts and the Federal Trade Commission Act were quite sufficient to deal with such conduct. 508 F.2d at 561.

**33.** Deposition of Alfred G. Franz, p. 22 (docket # 124).

**34.** Deposition of Robert Cooper, p. 68 (docket # 119).

quality as defendant's and that defendant's service and repeater coverage are better than plaintiff's appear, as they did in *Whitten,* to be nothing more than standard "salesman puff." Indeed, plaintiff tells some of its customers that it offers a "sturdier," "more durable" radio than Motorola; that it can "provide better service than Motorola"; and that its equipment and repeater coverage "were better than the others."[35] Moreover, such product comparisons, far from being illegal, have actually been encouraged by the Federal Trade Commission in order to help consumers obtain information which is "relevant and useful in making an informed choice between competing products."[36]

■ In short, then, plaintiff's attempt to monopolize theory is not viable upon the facts upon which it is based. While the desire to clean up all the practices of the marketplace is undeniably a laudable objective, the antitrust laws were neither intended to be, nor constitute, the best means of implementing this objective. *See Apex Hosiery v. Leader,* 310 U.S. 469, 512, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); *Whitten v. Paddock Pool Builders, supra.* Accordingly, to allow the conduct complained of by plaintiff, without more, to be actionable under the antitrust laws would not be proper and could have the very serious consequence of deterring, and indeed prohibiting (were the court to make an improper diagnosis of defendant's conduct) desirable and competitive behavior. Such a ruling would also increase the possibility that some competitors could transform the antitrust laws from a powerful legislative weapon, designed to destroy certain anticompetitive practices, into a corporate shield that would instead protect inefficient business from the effective competition of its rivals.[37] Indeed plaintiff apparently attempts to use the antitrust laws in just this fashion.

For instance, plaintiff asks this court for injunctive relief that would, *inter alia,* prevent defendant from permanently "soliciting or contacting any of plaintiff's present customers for the purpose of selling private two-way radio equipment." It argues that defendant's practice of contacting customers of its competitors and giving them truthful information about those competitors' shortcomings or "goof-ups" is unfair and provides evidence of defendant's intent to monopolize.[38] Hence, it is clear that plaintiff brings this action under a distorted interpretation of antitrust law.

■ Hard competition in which one party inevitably makes a sale or increases its market share at the expense of another party is neither unfair nor a violation of the

---

**35.** Deposition of Gary Peters, pp. 6, 18–19 (docket # 49); Affidavit of Howard Blair, ¶ 40 (docket # 81).

**36.** F.T.C. News Release, 1–03–20, dated March 30, 1972.

**37.** As one commentator notes, "[t]he very ability to impose on competitors the heavy burden of antitrust litigation over claims that cannot be dismissed at the outset is dangerously anticompetitive in itself." Cooper *supra* note 22 at 451. *Cf. Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 96 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

**38.** For example, Mr. Dunaway, General Sales Manager of General Communications Engineering, contends that defendant's act of contacting Michael Lucero of Kaiser Sand & Gravel and informing him that the F.C.C. license prepared for him by G.C.E. was incorrect is actionable. Plaintiff contends that such action un⌐ ⌐cessarily cost G.C.E. approximately two weeks of time and possibly some of the confidence of its customer. Similarly, plaintiff complains of an instance in which a Motorola salesman mentioned to the manager of Laird's Office and Supply, a "customer" of plaintiff, that he had noted that a Laird's license application had just been filed with the F.C.C. This came as a surprise to the manager who had been told by Mr. Dunaway that the application had been filed some two months earlier. As a result of the Motorola salesman's remark, Laird's contacted G.C.E. and discovered that there had been an error and that the application had only just been filed. This distressed Laird's, and despite G.C.E.'s assurances that they would try and expedite matters, Laird's invited Motorola to submit a proposal, which was ultimately declined. Plaintiff contends that it should be compensated for the time that it had to spend with Laird's recementing its order.

antitrust laws. To be sure, plaintiffs would be more successful were it permitted to use the antitrust laws to place those whose business it wishes to secure or retain "off limits" to defendant and other competitors. However, the antitrust laws were not designed to immunize competitors from the public-serving rigors of the market place; rather they were supposed to advance the system of free competition to the fullest extent practicable, all to the end that the consuming public might receive better goods and services at lower prices. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Yet, the granting of the injunctive relief that plaintiff requests would deny plaintiff's customers the very competitive benefits that the antitrust laws were designed to protect.[39] Moreover, by granting the injunctive relief that plaintiff seeks, this court would itself be creating an antitrust violation. *See United States v. Consolidated Laundries Corp.,* 291 F.2d 563 (2d Cir. 1961), (holding that an agreement among competitors to compete only for new customers and not to solicit each others existing customers was per se illegal.) *Also see United States v. Topco Association,* 405 U.S. 596, 611–12, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Addyston Pipe & Steel Co. v. United States,* 175 U.S. 211, 242–43, 20 S.Ct. 96, 44 L.Ed. 136 (1899).

■ To summarize then, plaintiff's attempt to monopolize theory is not applicable here. While plaintiff may have a viable cause of action under state law or the Federal Trade Commission Act, this court does not believe that defendant's conduct, even accepting plaintiff's version of it, is sufficient to support the requisite inference of intent to monopolize under section 2. While this conclusion is itself dispositive of plaintiff's attempt to monopolize claim, we also have serious doubts as to whether plaintiff can show the requisite dangerous probability of success.

b. *Dangerous probability of success.* Plaintiff contends that the record shows that defendant possesses sufficient market power to prove that there is a dangerous probability that defendant's attempt to monopolize will be successful. In fact, plaintiff maintains that the evidence supports a finding that defendant has monopoly power. It relies on Motorola's advertisements in the Yellow Pages, which state "Motorola specified more often than all other brands combined." It also points to statements of Motorola's agents that they are the dominant company in the market, arguing that this court should presume defendant knows what it is talking about when it makes these assertions.

■ More to the point, plaintiff relies on testimony of a former Motorola employee, which indicates that when he worked for Motorola in 1970, it had approximately 71% of the market.[40] Other evidence indicates that in 1973 Motorola had approximately 64% of the mobile communication radio market.[41] However, even assuming that such evidence is in fact probative of Motorola's market share, it is not conclusive of defendant's market power. *See* P. Areeda, *supra,* note 22 at 195–201. Cf. *Power Replacements Corp. v. Air Preheater Co., Inc., supra* at 896. In fact, the evidence in the record indicates that despite Motorola's large market share, the private two-way radio communications market is so competitive that it virtually precludes a finding

---

**39.** It cannot be overlooked, for instance, in the Kaiser Sand & Gravel incident, that Kaiser was grateful that Motorola had correctly pointed out a problem which Kaiser might have in securing F.C.C. licenses. Indeed, Kaiser regarded Motorola's comments as a service—one which would not have been received were plaintiff's contentions to prevail. Deposition of Michael Lucero, pp. 11–12 (docket # 126). Similarly, were it not for Motorola's comment to the manager of Laird's Office Supply, that business might have experienced further delay in obtaining its license.

**40.** Deposition of Ernest Luckhardt, pp. 26–27 (docket # 70).

**41.** Communications Magazine, September 1974 at p. 1. (Attached as Exhibit A to "Response of the Plaintiff in Opposition to the Motion for Summary Judgment—docket # 58).

that Motorola is in dangerous probability of achieving a monopoly.[42]  *See Cliff Food Stores Inc. v. Kroger Inc.*, 417 F.2d 203, 207 (5th Cir. 1969).

As the affidavits of both parties repeatedly reveal, when a prospective purchaser of private two-way radio equipment decides to enter the market, it receives bids from a number of sellers, usually including at least the plaintiff, the defendant, General Electric and R.C.A. Each firm presents a different package, suggesting exactly what equipment at what price can satisfy the customers' needs.[43]  In addition, the success with which each company is able to service its radios and to obtain the necessary licenses from the F.C.C. is a further source of great competition.[44]  In short the picture that emerges from the record is that the private two-way radio communications market is a fiercely competitive one, where,

when customers become dissatisfied, they are in a position to do something about it.

Thus, representatives of Delta Truck Lines and Bus Express Service state that each of their companies became dissatisfied with the service provided by G.C.E. and decided to solicit proposals from other companies.[45]  Similarly, although Motorola had initially secured the order of All-Cal Contractors, that company decided to give its order to plaintiff after becoming dissatisfied with Motorola's apparent delay in obtaining a license from the F.C.C.[46]  Upon learning from Motorola that its license application had been delayed, the Kennedy Company, by "yelling and screaming a little" and by implicitly threatening to fill its order elsewhere, was able to convince the plaintiff to give it loaner radios until its radios arrived.[47]  Similarly, upon hearing that the frequency that plaintiff had select-

**42.** In point of fact, were this court actually required to reach this issue, we might be forced to defer our decision until the parties supplied further information on the relevant product and geographic markets. However, for purposes of this discussion, we assume that the relevant product market consists of all private two-way radio communications equipment and that the relevant geographic market consists of the Bay Area and Northern California, the area in which plaintiff admits to do virtually almost all of its business. *See* deposition of Walter F. Corbin at pp. 17–18 (docket # 52).

It must be remembered that plaintiff's attempt claim is predicated upon defendant's use of alleged unfair practices against it pursuant to a plan to drive it from the marketplace. Accordingly, it would appear that the relevant geographic marketplace to which this court should look is the marketplace in which plaintiff competes. *Cf. Becker v. Safelite Glass Co.*, 244 F.Supp. 625, 637 (D.Kan.1965). While it is true that it is the dangerous probability of success of the defendant that this court is in part trying to assess, the fact that defendant has market power in a different part of the country is not a particularly relevant factor if the defendant does not have the power to set prices or exclude competition in the market from which it desires to drive plaintiff. The only relevance of defendant's market power elsewhere might be to show its ability to engage in a course of predatory pricing against the plaintiff: however, as previously noted, plaintiff has failed to set forth any evidence that would indicate that this is actually being done. *See* notes 25 and 17 *supra*.

To the extent that plaintiff charges defendant with attempting to monopolize a broader geographic market by relying on defendant's alleged unfair practices against other competitors in markets in which plaintiff does not compete, we do not believe that plaintiff has standing to make such charges. *See In re Multi-District Vehicle Air Pollution M. D. L., No. 31*, 481 F.2d 122 (9th Cir. 1973).

**43.** Ted Peters Co. regards price as the most important factor in choosing among the various sellers of private two-way radio communications equipment, and for that reason states that it would probably deal with G.C.E. or R.C.A. the next time around. Deposition of Gary Peters, p. 24 (docket # 49).

**44.** Thus, a representative of Panoply Patrol indicates that as a result of his company's experiences, "prompt delivery" would be the most important factor in choosing among suppliers of radio equipment in the future. Sworn statement of Howard K. George, p. 6 (docket # 143).

**45.** Deposition of William Bacigalupi, pp. 4–5, 8, 20–21 (docket # 52); Deposition of Jim Oates, pp. 6, 9 (docket # 56).

**46.** Subsequently, All-Cal returned its business to the defendant having become disappointed with the level of service provided by the plaintiff.

**47.** Sworn statement of Thomas Kennedy, p. 6 (docket # 144).

ed for its newly purchased radio equipment might only be appropriate for one-way use, Hudson Lumber was able to obtain plaintiff's guarantee that if the frequency obtained was not suitable for two-way radio use, plaintiff would cover the cost of replacing necessary crystals or changing the appropriate frequencies so that the radios could be used for two-way use in the future.[48] The benefits of a competitive marketplace are also illustrated by the experience of Blair Excavation, which, after talking to a salesman from R.C.A., found it necessary to change its order with the plaintiff to a type of radio different from that which the plaintiff had ordered for him six months previously. As Mr. Blair explained, "I never knew they had [the feature I wanted] until I spoke to the man at R.C.A." [49]

Thus, in stark contrast to plaintiff's assertion that the private two-way radio communications market is uncompetitive and dominated by defendant, it appears that it is the purchasers of private two-way radio communications equipment, not the defendant or any of its competitors, who have the power. While Motorola may have a large market share today, it is apparent from the competitive nature of the industry that if it attempted to raise prices or reduce the quality of its equipment or service, its market share would rapidly diminish.[50]

■ c. *Summary.* This court is of the opinion that even accepting plaintiff's version of the material facts in dispute as true, plaintiff would not be entitled to a judgment as a matter of law under its attempt

to monopolize claim. We do not believe that the facts that plaintiff relies on are sufficient to support either an inference that defendant had a specific intent to monopolize or that it had sufficient market power to constitute a dangerous probability of success. Therefore, it is this court's decision that defendants are entitled to summary judgment with respect to count 1 of the complaint.

■ In so ruling we are not unmindful of the general rule that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles . . . ." *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). However, we note that this principle cannot be inflexibly applied to allow anyone who files an antitrust suit the right to proceed to trial notwithstanding the absence of "any significant probative evidence tending to support the complaint." *First Nat'l Bank v. Cities Service,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). *See McGuire v. Columbia Broadcasting Service,* 399 F.2d 902 (9th Cir. 1968).

In *Cities Service,* plaintiff had acquired a contractual right to import Iranian oil after the government had nationalized plaintiff's oil wells. Following some initial negotiations with plaintiff concerning the purchase by Cities Service of some of plaintiff's oil, Cities Service declined to enter into any agreement. Plaintiff sued claiming that Cities Service's decision was the result of a group boycott with seven other oil companies.

**48.** Sworn statement of Robert Hanscom, p. 3 (docket # 146).

**49.** Sworn statement of Howard Blair, p. 11 (docket # 153).

**50.** The only evidence which tends at all to indicate that Motorola has sufficient market power to exclude competition is the affidavit of Dean Hovey of Palomar Communications in Escondido, California. Mr. Hovey relates Motorola's practice of discounting prices up to 25% of its list price, and causing his firm to lose substantial amounts of business until it too decided to reduce prices. However, whatever the substance of these allegations, they are irrelevant

to this action, having occurred in a market in which plaintiff admits to having no interest.

Plaintiff's reliance on a 1972 congressional report which indicates that Motorola dominated the sale of police radio equipment that was purchased with LEAA funds in Arkansas and Wisconsin is similarly not relevant here. *See* House Comm. on Gov't Operations, "Block Grant Programs of the Law Enforcement Assistance Administration," H.R.Rep. 92–1072, 92d Cong., 2d Sess. 1972. Moreover, it should be noted that the report only represented the views of six of the ten subcommittee members and that though advised of the charges made in the report, the Justice Department has taken no action against Motorola.

Plaintiff argued that from Cities' failure to follow through on its original substantial interest in dealing with him, the court could infer Cities' participation in the boycott allegedly organized by the other defendants. The court, while conceding that given no contrary evidence a jury question might be presented, ruled that in light of the entire record before it, it would not draw the inference plaintiff suggested and awarded summary judgment to Cities Service.[51]

■ Like the plaintiff in *Cities Service,* plaintiff here submits that this court can infer from defendant's unfair trade practices and large market share an intent to monopolize and a dangerous probability of success. However, as in *Cities Service,* these inferences are contradicted rather than supported by the record that plaintiff relies on. Accordingly, defendant's motion for summary judgment with respect to count 1 is hereby granted.

2. *The California Cartwright Act.* The Cartwright Act (Bus. & Prof.Code §§ 16700–16800), the California law of antitrust, makes unlawful any "trust," defined as "a combination of capital, skill, or acts by two or more persons for *inter alia* the following purposes: (a) to create or carry out restrictions in trade or commerce. . . . (c) to prevent competition in . . . purchase of . . . any commodity." Bus. & Prof.Code § 16720.

■ Despite its somewhat different language, the Cartwright Act was patterned upon the Sherman Act, and both have their roots in the common law. Thus, federal cases interpreting the Sherman Act are applicable with respect to the Cartwright Act. *See Chicago Title Ins. Co. v. Great Western Financial Corp.,* 69 Cal.2d 305, 70 Cal.Rptr. 849, 444 P.2d 481 (1968). Accordingly, for the same reasons stated in regard to plaintiff's claim under section 2 of the Sherman Act, defendants are entitled to summary judgment with respect to count 2 of the complaint.

3. *Other State Law Claims.* In part A of this opinion, we found that there were many material questions of fact as to whether defendant disparaged plaintiff's product and service, and as to whether the defendant suggested to companies who had dealt with plaintiff that they break existing commitments with plaintiff so that they could instead deal with the defendant. In sections 1 and 2 of part B of this opinion, we held, that assuming plaintiff's version of these factual questions to be true, plaintiff would not be entitled to judgment as a matter of law under the Sherman and Cartwright Antitrust Acts.

■ Notwithstanding that holding, and despite this court's belief that many of the defendant's alleged disparaging remarks were merely standard "sellers puff" and that by and large Motorola's solicitation of customers was conducted pursuant to standard industry practice, as well as its general right to conduct business in competition with that of another, *see Chapman Building Co. v. Cal Mart,* 2 Cal.App.3d 846, 855, 82 Cal.Rptr. 830, 836 (2d Dist. 1969), we cannot say that all of the defendant's practices and actions complained of were conducted within permissible bounds. In response to defendant's argument that even if some acts were tortious the evidence is clear that no business was lost, we reiterate that loss of business, while perhaps the commonest and easiest proof of damages, is not the only measure of plaintiff's damages.

■ Accordingly, defendant's motion for summary judgment with respect to count 3 is hereby denied.

IT IS SO ORDERED.

---

**51.** The court also went on to refute the evidence other than the simple failure to deal that plaintiff had also relied on to show Cities' part in the conspiracy. 391 U.S. at 280–84, 88 S.Ct. 1575.