HUDSON VALLEY ASBESTOS COR-
PORATION, Plaintiff-Appellant,

v.

TOUGHER HEATING & PLUMBING
CO., INC., et al., Defendants-
Appellees.

No. 79, Docket 73-2370.

United States Court of Appeals,
Second Circuit.

Argued Oct. 31, 1974.

Decided Jan. 21, 1975.

Certiorari Denied June 9, 1975.

See 95 S.Ct. 2416.

Lambert L. Ginsberg, Troy, N. Y. (Pattison, Herzog, Sampson & Nichols, P. C., Troy, N. Y., of counsel), for plaintiff-appellant.

Joseph W. Burns, New York City (Burns, Van Kirk, Greene & Kafer, Martin J. Neville, New York City, of counsel), for defendants-appellees.

Before LUMBARD, MOORE and MANSFIELD, Circuit Judges.

1142

MOORE, Circuit Judge:

Hudson Valley Asbestos Corporation (Hudson Valley) brought this private antitrust treble damage action alleging violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and sections 3 and 7 of the Clayton Act (15 U.S.C. §§ 14, 18). The principal defendants were Tougher Heating & Plumbing Co., Inc. (Tougher), E. W. Tompkins Co., Inc. (Tompkins), Robert Tougher and Harry E. Tompkins, Sr., the respective presidents of these companies, and Tri-City Insulation Company, Inc. The case was tried before the United States District Court for the Northern District of New York, which rendered an opinion and judgment in favor of the defendants. Thereupon Hudson Valley appealed. We affirm.

In 1922 Marshall Pursel formed Hudson Valley in Albany, New York, as an insulation contracting business. Although the insulation aspect of the company became far less important as the firm expanded into other areas, accounting for an annual average of approximately 5% of net sales by 1960, Hudson Valley continued to engage in insulation contracting until September 30, 1961.

Tougher and Tompkins are two plumbing and heating contractors also located in the Albany area. In the course of their business Tougher and Tompkins, as prime contractors, would submit bids to perform the plumbing and heating work on a certain job. Their bids would be based on the bids submitted to them by various subcontractors, including insulation subcontractors such as Hudson Valley. If Tougher or Tompkins was awarded the prime contract, it would in turn either award the insulation subcontract to the lowest bidder or give another company an opportunity to match the lowest bid. Between 1957 and 1961 Tougher and Tompkins together accounted for over 40% of the dollar volume of Hudson Valley's insulation contracts.

In May 1961 Robert Tougher and Harry E. Tompkins, Sr. first discussed the possibility of forming their own insulation subcontracting company. They were dissatisfied with the subcontractors with whom they had been dealing and wanted to obtain fair and reasonable prices for insulation work. A month later they each invested $5,000 and founded defendant Tri-City, which was incorporated on June 29, 1961 and commenced doing business on July 31. Shortly thereafter, in August 1961, Henry Kuhl, who had single-handedly managed Hudson Valley's insulation business for many years, sought employment at Tri-City and signed an employment contract for about 40% greater salary than he had received at Hudson Valley plus an incentive bonus of 10% of profits. Pursel made the decision to terminate the insulation business almost immediately, and voluntarily returned two already existing insulation subcontracts to Tougher.

█ The gravamen of the plaintiff's complaint is that antitrust violations committed in connection with the formation and operation of Tri-City drove Hudson Valley out of the insulation business by eliminating Tougher and Tompkins as potential customers. However, the district court explicitly found that Hudson Valley voluntarily terminated its insulation contracting business and that there was no causal connection between the alleged antitrust violations and this business decision. Particularly in light of the departure of plaintiff's long-time manager and the rather precipitous termination soon thereafter, we are unable to say that this finding was erroneous.

█ Failure to prove that it was injured "by reason of" the defendants' alleged antitrust violations is of course sufficient to defeat Hudson Valley's claims. Clayton Act § 4, 15 U.S.C. § 15 (1970); *see* Billy Baxter, Inc. v. Coca Cola Co., 431 F.2d 183, 187 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971). Nevertheless, we shall briefly review the antitrust allegations, which we find to be without merit in any event.[1]

1. The district court found that the plaintiff had failed to prove that the interstate commerce requirements of the Sherman Act had been met, but the court nevertheless went on

Hudson Valley alleges that the defendants violated section 1 of the Sherman Act by engaging in both price fixing and a concerted refusal to deal with insulation subcontractors other than Tri-City. Either allegation, if true, would constitute a per se violation of Section 1. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (price fixing); Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (concerted refusal to deal). .

With respect to the price-fixing claim, the district court found no evidence that any such scheme existed. Although Tri-City was formed out of apparent dissatisfaction with the high level of the bids Tougher and Tompkins were receiving from insulation contractors, there is no indication that they conspired to set the level of Tri-City's bids. Indeed, Kuhl was apparently given a free hand to determine the figure Tri-City would submit on any particular job. His instructions were only to submit a fair price, which would reflect his costs plus some allowance for profit.

The contention that Tougher and Tompkins together refused to deal with insulation subcontractors other than Tri-City is also not supported by the evidence. Hudson Valley relies on statistics showing that between 1961 and 1965 Tri-City received all but one of the insulation subcontracts awarded by Tougher and Tompkins in Albany, Schenectady, and Rensselaer Counties. At the same time, however, the three other insulation subcontractors in this area had refused to submit bids to Tougher and Tompkins, and when J. F. Swick Insulation Co., a

to consider the substance of the allegations. We disagree with the jurisdictional ruling. The reach of the Sherman Act is the full extent of Congress' broad commerce power. *E. g.,* Gulf Oil Corp v. Copp Paving Co., 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974); United States v. Southeastern, Underwriters Association, 322 U.S. 533, 558, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944); Rasmussen v. American Dairy Association, 472 F.2d 517, 521 (9th Cir.), cert. denied, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973). Thus, a holding that certain activity is outside the reach of the Sherman Act constitutes a determination that the conduct is beyond Congress' power to regulate. Yet the proposition that courts have placed few limits on the commerce power needs little documentation. *E.g.,* Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). Congress may regulate purely intrastate activity as long as the conduct has a substantial effect on interstate commerce. Wickard v. Filburn, 317 U.S. 111, 125, 63 S.Ct. 82, 87 L.Ed. 122 (1942). Although in this case all contracting work involved was done only in New York State, Hudson Valley, while it was still operating, Tri-City, and other insulation contractors continually purchased substantial quantities of insulation materials from suppliers located outside New York for delivery and installation at work sites. Thus, the formation of Tri-City and the demise of Hudson Valley caused at least a diversion in the flow of interstate goods. Moreover, the plaintiff's allegations concerning a concerted refusal to deal, price fixing, and conspiracy to monopolize, had they been proved, certainly could have had a substantial effect on the interstate shipment

of insulation materials. Presumably the level of competition among contractors would affect the price at which contracting services were offered, and this would in turn affect the level of construction activity and hence the demand for insulation materials. Under these circumstances we are unwilling to say that such anticompetitive conduct as is alleged by Hudson Valley is beyond congressional control.

The district court did not expressly consider whether the jurisdictional requirements of Clayton Act §§· 3 and 7 had been met (although by implication the court was of the view that they had not, since the Clayton Act of course cannot reach beyond what the Constitution allows). It is unclear whether the Sherman Act and the Clayton Act are coextensive in this respect. In contrast to the language contained in the Sherman Act § 1 (prohibiting conduct "in restraint of trade or commerce among the several States, or with foreign nations . . .."), Clayton Act §§ 3 and 7 prohibit activities by persons and corporations "engaged in commerce." The Supreme Court recently declined to decide whether this difference in language gives the Clayton Act provisions a jurisdictional reach that is more limited than that of the Sherman Act. Gulf Oil Corp. v. Copp Paving Co., *supra* at 186, 95 S.Ct. 392, 42 L.Ed.2d 378. Since Hudson Valley's Clayton Act allegations fall outside of the statute for other reasons, however, *see* discussion *infra,* we need not decide the reach of the Clayton Act and, if it be narrower than that of the Sherman Act, whether the activities involved in this case would fall within it.

new entrant in 1966, in competition with Tri-City, did submit a bid to Tougher, Swick received the award. Thereafter, the other insulation contracting companies also began to submit successful bids to Tougher and Tompkins. In addition, within the eleven-county geographic market for insulation subcontracting that the district court found to be appropriate,[2] companies other than Tri-City were awarded subcontracts despite the fact that Tri-City had submitted competing bids.

Although Hudson Valley's allegations under section 2 of the Sherman Act are not framed with the utmost clarity, their thrust is that Tougher and Tompkins unlawfully conspired to monopolize. Unfortunately, the market at which the alleged conspiracy was supposedly directed is not precisely defined.[3] The district court found that plumbing and heating contracting and insulation contracting respectively constituted distinct submarkets. Whether the plaintiff views both of these submarkets as the target of the conspiracy is not clear. In any event, it is plain that the district court's finding that there was no section 2 violation was proper. With respect to the plumbing and heating contracting submarket, there were sixteen companies located in the three counties around Albany alone, and the district court found that competition was vigorous both before and after the formation of Tri-City. In the insulation contracting submarket there were, in addition to Tri-City, three companies located in Albany—Arm-

strong Cork, R. A. Keasbey, and Johns-Manville. All were strong nationally-based concerns. Thus, it is patently obvious that the defendants had no power to control either market. Although specific intent to monopolize, and not monopoly power, is the essential element when a conspiracy to monopolize is involved, United States v. Consolidated Laundries Corp., 291 F.2d 563, 573 (2d Cir. 1961), the absence of any likelihood of success is certainly some evidence on the question of whether such specific intent existed. And here the futility of any effort to monopolize either submarket as shown by the evidence referred to above, coupled with the repeated denials of the defendants, amply supports the finding of the district court.

Hudson Valley's contention under Clayton Act § 3 is that the defendants agreed that Tri-City would supply all the insulation subcontracting needs of Tougher and Tompkins. This requirements contract, Hudson Valley argues, violated section 3 by foreclosing a substantial share of the market to competitors of Tri-City. See, e.g., Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

No such contract existed in writing, and in light of the evidence already discussed with respect to the alleged concerted refusal to deal, it is apparent that there was not even an informal understanding to that effect. More importantly, however, section 3 applies only to contracts "for the sale of goods, wares, merchandise, machinery, supplies, or oth-

2. Hudson Valley contends that the district court's designation of an eleven-county area as the proper geographic market for insulation subcontracting was improper. According to Hudson Valley a three-county area immediately around Albany is the correct geographic market.

   The definition of the relevant geographic market requires "careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961). We cannot say that the district court used improper means to arrive at the appropriate market. The court relied

mainly on statistics showing that a substantial proportion of Hudson Valley's insulation contracts were outside the three-county area but within the eleven-county area ultimately adopted. There was also evidence that Tri-City, after it was formed, competed in the eleven-county area. Furthermore, there was testimony that even for jobs in Albany insulation contractors outside the city were invited to submit bids.

3. At one point in its brief the plaintiff refers to the success of Tougher and Tompkins in receiving for Tri-City "a monopoly of the business controlled by their companies . . . .." (Appellant's Brief at 31). This is of course not a market at all.

er commodities . . .." 15 U.S.C. § 14. As found by the district court, "[t]he insulation contracting business consists primarily of the service of covering pipes and ducts, not supplying materials." That insulation subcontractors may provide the insulation materials which are installed is incidental to their principal function, which is to provide services. It is, of course, well settled that section 3 does not apply to sales of services. *See* United States v. Jerrold Electronics Corp., 187 F.Supp. 545, 554 (E.D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961).

 The plaintiff's claim under Clayton Act § 7 is also outside the bounds of the statute. Hudson Valley argues that the formation of Tri-City was a joint venture which substantially lessened competition. Although section 7 does apply to joint ventures, United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964), the provision expressly reaches only acquisitions, direct or indirect, by corporations. *See* Bender v. Hearst Corp., 152 F.Supp. 569, 578–579 (D.Conn. 1957), aff'd, 263 F.2d 360 (2d Cir. 1959). Here Tri-City was formed not by two corporations but by two individuals, Robert Tougher and Harry E. Tompkins, Sr. Hudson Valley seeks to avoid the import of this shortcoming by arguing that the venture was in fact an indirect acquisition by Tougher and Tompkins.

Section 7 may apply in some circumstances to corporations when stockholders make an acquisition on its behalf. GAF Corp. v. Circle Floor Co., 329 F.Supp. 823, 829 (S.D.N.Y.1971), aff'd, 463 F.2d 752 (2d Cir. 1972), cert. dismissed, 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973). But this case does not present such a situation. The money to form Tri-City was invested by Robert Tougher and Harry E. Tompkins, Sr. There is no allegation that it came from their corporations. Although these two men were the presidents and controlling shareholders of Tougher and Tompkins respectively, substantial portions of the companies were owned by others and

only one other shareholder of either company became a shareholder of Tri-City. Nor is there any indication that Tougher and Tompkins either planned to control or did control the activities of Tri-City. In short, it was the investments of Robert Tougher and E. W. Tompkins Sr. which were at stake in the formation of Tri-City and under those circumstances section 7 does not apply.

Having considered the points raised by the appellant, we find no basis for disturbing the judgment of the district court. Accordingly, the judgment of the district court is hereby affirmed.