Earl MOWERY, d/b/a Mowery's
Sohio, Plaintiff,

v.

STANDARD OIL COMPANY OF
OHIO, Defendant.

No. C 73–97.

United States District Court,
N. D. Ohio, W. D.

Oct. 28, 1976.

George R. Royer, Toledo, Ohio, for plaintiff.

David A. Nelson, Squire, Sanders & Dempsey, Cleveland, Ohio, Donald F. Melhorn, Jr., Marshall, Melhorn, Bloch & Belt, Toledo, Ohio, for defendant.

OPINION and ORDER

WALINSKI, District Judge.

The case *sub judice* is a private antitrust action brought by Earl Mowery, formerly the operator of a Standard Oil service station in East Toledo, Ohio, under a Consignment Dealer Agreement,[1] against the Stan-

---

1. Standard Oil retails gasoline in Ohio under the trade name "Sohio" in two ways. The

company owns a number of stations, at which stations it employs assistance and totally con-

dard Oil Company of Ohio, a vertically integrated corporation which refines, wholesales and retails gasoline throughout the state of Ohio.[2] Jurisdiction is pursuant to 28 U.S.C. § 1337, as the plaintiff alleges violations of 15 U.S.C. §§ 1 to 7 and 13.

Trial was commenced to a jury on September 7, 1976, and continued time to time. At the close of plaintiff's case, both parties moved for a directed verdict pursuant to Rule 50, Federal Rules of Civil Procedure.

## I.

■ The Court is fully aware of the Supreme Court's admonishment that summary procedures, including directed verdicts, should be used "sparingly in complex antitrust litigation where motive and intent play leading roles * * *." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). However, where a plaintiff fails to come forward with enough evidence "to support a reasonable finding in his favor, a district court has a duty to direct a verdict in favor of the opposing party." *Chrisholm Bros. Farm Equipment Co. v. International Harvester Co.*, 498 F.2d 1137, 1139–40 (9th Cir. 1974). *Accord, Westinghouse Electric Corp. v. CX Processing Laboratories*, 523 F.2d 668, 673 (9th Cir. 1975). The standard to be applied in determining the appropriateness of a directed verdict in an antitrust case is clearly set forth in *Chrisholm, supra*:

* * * the correct standard is whether or not, viewing the evidence as a whole, there is substantial evidence present that could support a finding, by reasonable jurors, for the nonmoving party. 'Substantial evidence is more than a mere scintilla.' The evidence must be examined in the light most favorable to the nonmovant, and there can be *no weighing* of evidence. Finally [plaintiff] is entitled to the benefit of all *reasonable* inferences that may be drawn from its evidence. *Chrisholm*, 498 F.2d at 1140 (citations omitted).

Applying this rigorous standard to the instant case, the Court finds the defendant to be entitled to a directed verdict on all counts of the Complaint.

## II.

Count I of plaintiff's Amended Complaint alleges that defendant Standard Oil "employed, enacted, and carried out a price fixing policy", such being a *per se* violation of § 1 of the Sherman Act.[3] Plaintiff's Second Count, which is also based on § 1 of the Sherman Act, alleges that defendant "effectuated an illegal and unreasonable restraint of trade."

■ To establish a violation of § 1 of the Sherman Act, three elements must be shown:

1) a contract, combination or conspiracy,

2) affecting interstate commerce,[4] and

3) an unreasonable restraint of trade.

---

trols all business operations, including price policy. Stations operated in this manner will hereinafter be referred to as "company owned stations." Standard Oil also enters into Consignment Dealer Agreements with independent businessmen under which the dealer agrees to market Sohio gasoline under certain conditions. Such stations are individual business entities totally separate from the Standard Oil Company. For the purposes of this Opinion, such stations will be referred to as "independent dealerships" and their operators will be referred to as "independent dealers."

2. Standard Oil of Ohio apparently imports crude oil into Ohio where it is refined into gasoline. The company has refineries in both Lima and Toledo, Ohio. The testimony indicates that Sohio retails its Ohio refined gasoline

in both Ohio and Michigan. Standard Oil is apparently also engaged in the sale of other automotive parts and accessories at its retail outlets.

3. Section 1 provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1.

4. For the purpose of resolving the § 1 allegations only, the parties have stipulated that the transactions involved do "affect interstate commerce" within the meaning of the Sherman Act.

As proof of elements one and three, plaintiff introduced evidence which, when viewed in the light most favorable to him, tended to establish the following:

Due to the influx of private brand [5] gasoline dealers into the Toledo market in the late 1960's and early 1970's, the retail gasoline market became increasingly competitive. The East Toledo market [6] was particularly competitive, resulting in an extended price war among area dealers. Plaintiff's Exhibits 23 and 25 demonstrate the trend in prices during the relevant period, 1970–73. In early 1970, Sohio company-owned stations typically priced regular gasoline at 36.9 cents per gallon, and independent Sohio dealers typically posted regular gasoline at 37.9 cents per gallon. However, private branders in the same area were setting their pump prices at around 32.9 cents per gallon and were sometimes dropping as low as 30.9 cents per gallon. In 1971, private branders and other major oil company dealers in the East Toledo area began to post regular gasoline around 29.9 to 27.9 cents per gallon, and for a period during 1972, private branders in the area sold as low as 23.9 cents per gallon.

In an effort to remain competitive and maintain its level of gallonage, it became Sohio's policy to adjust the prices at its company-owned stations to within 2 cents of the private branders, although it does not appear that Sohio ever posted below 27.9 cents per gallon during the relevant period. Sohio apparently surveyed the market on almost a daily basis in order to determine where it was necessary to set its price to remain competitive.

During the same period the plaintiff, an independent Sohio dealer, also began to lose gallonage. The plaintiff was obviously faced with a dilemma. To maintain his gallonage, he would have to reduce his pump price. However, if he reduced his pump price while the tank wagon price at which he purchased gasoline from the defendant remained constant, his margin of profit on each gallon of gas sold would be reduced and, barring a significant increase in the gallonage pumped, his gross profit would be reduced as well.

Standard Oil was of course well aware of the plaintiff's dilemma, as it was experiencing the same profit squeeze. And although Standard Oil was under no legal or contractual obligation to assist the plaintiff and its other independent dealers in any way, it did respond to the situation by instituting a Temporary Competitive Allowance Program, hereinafter referred to as TCA.

There is no dispute among the parties as to how the TCA program operated. Beginning in 1970, and continuing through early 1973, Standard Oil offered to its independent dealers "an allowance equal to .7¢ per gallon of gasoline (off posted tank wagon price) for each 1¢ reduction in dealer's retail price commencing at 1¢ below a retail price of 37.9¢ for [regular] * * *." An allowance was offered down to the level at which company-owned stations were currently setting their pump prices.

TCA's were apparently offered to the independent dealers on a regular basis, each offer designating the price down to which Sohio would give the .7 cents per gallon allowance. Acceptance or rejection of a TCA by the dealer was solely within his discretion. He could reject the TCA, accept a full TCA, or accept a partial TCA; and having once accepted, he could thereafter cancel at any time. Thus, the independent dealer clearly remained free to set the price at his station at whatever price he chose. Under the TCA program, however, he could not receive the allowance off the posted tank wagon price unless he reduced his pump price.

---

**5.** "Private branders", as that term was used at trial, refers to stations operated by non-majors. Private branders typically are "gas and go" operations with little overhead. Private branders operating in the East Toledo market during the relevant period included Hi Fy, Tulsa, Red Head and Bonded.

**6.** The East Toledo market, though not precisely defined at trial, consists essentially of all of Toledo east of the Maumee River. The Standard Oil Company apparently did recognize East Toledo as a distinct market area.

Plaintiff's evidence established that throughout the relevant period, various independent dealers in East Toledo, including himself, did enter into TCA agreements with Standard Oil. Plaintiff seeks to characterize these agreements as illegal price fixing agreements in violation of § 1 of the Sherman Act. It is the plaintiff's further contention that the defendant's conduct caused him to lose gallonage and to eventually go out of business. Accordingly, plaintiff seeks to recover his alleged damages from the defendant.

### III.

■ Although early case law construing § 1 of the Sherman Act appeared to apply a "rule of reason" standard to test the legality of any conduct alleged to be in restraint of trade, the Supreme Court made it clear in *United States v. Socony Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), that:

> Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se.*

310 U.S. at 223, 60 S.Ct. at 844. *Accord, United States v. Container Corp. of America,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969); *United States v. McKesson Robbins,* 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 143, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). *Cf. Lamb Enterprises, Inc. v. Toledo Blade Co.,* 461 F.2d 506 (6th Cir.), *cert. denied,* 409 U.S. 1001, 93 S.Ct. 325, 34 L.Ed.2d 262 (1972). However, to establish a *per se* violation of § 1 of the Sherman Act, the plaintiff must present "[p]roof that a combination was formed for the purpose of fixing prices and that it caused them to be fixed or contributed to that result  \*  \*  \* ." *United States v. Socony Vacuum Oil Co.,* 310 U.S. at 224, 60 S.Ct. at 844.

Viewing the evidence in the light most favorable to the plaintiff, the Court cannot find that the plaintiff has carried his burden of proof in this respect. Plaintiff's own presentation of the evidence proved overwhelmingly that the plaintiff, as well as all other independent dealers under contract with Standard Oil, were free throughout the relevant time frame to set their gasoline prices at whatever level their own good business judgment might lead them to choose. Section 2(a) of the plaintiff's Consignment Dealer Agreement with Standard Oil, introduced into evidence as plaintiff's Exhibit 2, expressly provides that the "[d]ealer [plaintiff] is authorized to sell the consigned motor fuel at such retail prices as Dealer shall from time to time establish and charge at the station." Indeed, both of the independent dealers testifying at trial, Mr. Mowery and Mr. Losie, testified that they alone set the price of gasoline at their service stations.[7]

Similarly, both Mr. Losie and the plaintiff testified unequivocally at trial that they could accept the TCA offered by Standard Oil or refuse it at any given point in time. In fact, the plaintiff personally testified that he sometimes took the full TCA offered while at other times he refused the TCA, and at yet other times he accepted only a partial TCA. This is confirmed by plaintiff's Exhibit 25, which also demonstrates that other independent dealers varied their acceptance of the TCA in a similar manner. The language of the TCA form contract, introduced into evidence as plaintiff's Exhibit 3, expressly reserves to each dealer the right to set the price of gasoline at his own station:

> It is entirely within the discretion of each dealer to determine what retail price to charge at his station and to what extent, if any, he wishes to accept this allowance. This allowance will remain available to each dealer to whom it is initially offered until withdrawn by Sohio. Any accept-

---

7. *Contrast Sun Oil Co. v. FTC,* 350 F.2d 624 (7th Cir. 1965); *Atlantic Refining Co. v. FTC,* 344 F.2d 599 (6th Cir. 1965). In both cases, the consignment agreements between the distribu- tors and retailers, which were found to be unlawful price fixing agreements, expressly provided that the service station price of gasoline would be specified by the distributor.

ance of the allowance may thereafter be modified or withdrawn by a dealer at any time upon sufficient notice to Sohio in order to enable it to determine from meter readings the actual gallonage for which such allowance was applicable.

■ It is plaintiff's theory that the TCA program, though ostensibly leaving the dealers free to vary their prices, rose to the level of a price fixing agreement by virtue of Standard Oil's operation of the program *in conjunction with* price reductions by Standard Oil at its company-owned stations. Plaintiff argues that an illegal combination to fix prices can be inferred from the fact that the price of gasoline at Sohio's company-owned stations and the price at the independent dealer stations did in fact tend towards the same lower level, a trend which is confirmed by plaintiff's Exhibit 25. In response, the Court would simply note that mere evidence of parallel pricing does not, without more, satisfy plaintiff's burden of proving an agreement to fix prices.

Although "[n]o formal agreement is necessary to constitute an unlawful conspiracy," *American Tobacco Co. v. United States*, 328 U.S. 781, 809, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946), *similarity in the sale of standardized products does not alone make out a case of collusive price fixing, the reason being that competition will ordinarily cause one producer to charge about the same price charged by any other. United States v. International Harvester Co.*, 274 U.S. 693, 708–709, 47 S.Ct. 748, 71 L.Ed. 1302 (1927); *Cement Mfrs. Protective Ass'n v. United States*, 268 U.S. 588, 605–606, 45 S.Ct. 586, 69 L.Ed. 1104 (1925). The Supreme Court "has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that

such behavior itself constitutes a Sherman Act offense." *Theatre Enterprises, Inc. v. Paramount Film Dist. Corp.*, 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954). * * *

*Bendix Corp. v. Balax, Inc.*, 471 F.2d 149, 160 (7th Cir. 1972) (*Emphasis added*). *Accord, North Carolina v. Chas. Pfizer & Co., Inc.*, 384 F.Supp. 265 (E.D.N.C.1974); *Credit Bureau Reports, Inc. v. Retail Credit Co.*, 358 F.Supp. 780 (S.D.Tex.1971), *aff'd* 476 F.2d 989 (5th Cir. 1973).

■ In the present case, the only additional inference of price fixing arises from the plaintiff's testimony that the defendant's price cuts at its company-owned stations, in conjunction with its offer of a TCA conditioned on the plaintiff's own reduction in station price, "forced" him to "fix" his price at the same level posted by the company-owned stations. Plaintiff concedes that under all his written agreements with the defendant he was free to maintain his pump price at 37.9 cents per gallon, or reduce it or raise it to whatever level he chose. However, if the plaintiff left his price at 37.9 cents per gallon while prices at area stations were around 31.9 cents per gallon, his station, by the plaintiff's own testimony, would lose gallonage and therefore lose profit.

The plaintiff further testified that to maintain his gallonage, he was forced to reduce his price, and to be able to reduce his price without giving up his entire margin of profit,[8] he was "forced" to accept a TCA, which he asserted in turn "forced" him to fix his price at or around the price set by Sohio for its company-owned stations. Plaintiff would have this course of events characterized as a price fixing agreement. However, to borrow the language of the 5th

---

8. The evidence adduced at trial indicated that the tank wagon price of gasoline was 30.6 cents per gallon during the period in question. Thus, when the plaintiff was able to post a pump price of 37.9 cents per gallon, he earned a profit margin of 7.3 cents per gallon. Since Mr. Griffin of Standard Oil testified that Sohio felt that its independent dealers needed to maintain a profit margin of around 5 cents per gallon to remain "profitable," it is clear that independent dealers could not hope to stay within 2 cents of the private branders, who were posting around 29.9 cents per gallon, and still earn a reasonable profit. Acceptance of the TCA did, however, allow them to do so. An independent dealer could, for example, set his pump price at 31.9 and still realize a profit margin of 4.8 cents per gallon, because through the TCA, Sohio would absorb 3.5 cents of the 6 cent reduction from 37.9 to 31.9.

Circuit Court of Appeals, "This is a long way from a price-fixing agreement." *See Sun Oil v. FTC*, 294 F.2d 465, 483–84 (5th Cir. 1961), *rev'd on other grounds*, 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963).

The plaintiff's characterization notwithstanding, it was clearly the conditions of the marketplace and not the plaintiff's TCA agreement with Standard Oil, or the TCA agreements between the defendant and other independent dealers, which forced the plaintiff to reduce his price. It was the plaintiff's own testimony that he reduced his price and accepted the TCA in order to maintain his gallonage. There was no "agreement" with the defendant, formal or otherwise, which required the plaintiff to meet the price set by the defendant at its company-owned stations. The TCA program did not "force" the plaintiff to do anything. Rather, it *allowed* him to maintain a competitive market price without totally forfeiting his margin of profit.

Competitive allowance programs such as the one in evidence in this case are wholly supported by the relevant case law. In *Sun Oil v. FTC, supra*, for example, the court examined the inference of price fixing which the Examiner had drawn from evidence showing an agreement whereby Sun Oil gave its dealers a discount of 1.7 cents per gallon in order to allow the dealer, who had previously posted a price of 28.9 cents per gallon to reduce its price to 25.9 cents per gallon to meet competition. In concluding its opinion on this issue, the court stated:

> When Sun finally lowered its tank-wagon price to [the dealer], it is fair to assume that Sun would not have done so, if [the dealer] had intended maintaining his price of 28.9 cents a gallon. Such an arrangement would have given him a margin of 6.5 cents, clearly an unjustifiable preference over the other Sun dealers.
>
> This is a long way from a price-fixing agreement.

294 F.2d at 483–84.

The principle that an offer of a temporary competitive allowance to a dealer conditioned on a reduction of his retail price is wholly proper was re-affirmed in *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26 (5th Cir.), *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972). The evidence in *Lehrman* demonstrated that Gulf had offered the plaintiff, one of its dealers, a TCA to enable him to keep within 2 cents of a lower price posted by a competitor. Lehrman took the TCA but posted its price within 1 cent of the competition. When the competitor complained to Gulf, Gulf withdrew the allowance and refused to give the plaintiff any further price support. Lehrman was consequently forced out of business.

The district court found *Gulf's* behavior to violate § 1 of the Sherman Act, but in affirming the 5th Circuit made it clear that "the system [TCA] as a whole need not be condemned as anti-competitive since it is only Gulf's actions toward Lehrman that infected the system with its credible threat of reprisals for disobedience." 464 F.2d at 33. It was the court's opinion that Gulf's treatment of Lehrman had "transformed a practice *benign on its face* into a coercive practice with untold geographical potential for deterring Gulf retailers from freely determining their own retail prices." 464 F.2d at 32 (*Emphasis added*). In affirming the validity of the distributor's concern that the dealer allowance be accompanied by a reduction in the dealer's retail price, the court stated:

> We accept *arguendo* the assumption * * that generally the TCA system was designed to enable Gulf to respond through its wholesale prices to competitive conditions in the retail market. But only a very limited form of retail price policing promotes competition even if we agree that the wholesaler is entitled to some assurance that his price concessions are really needed by the retailer. *The supplier has a legitimate interest in satisfying himself that:* a) retailers of competing brands are charging no *more* than the price which they have been represented as charging; and b) *retailers of the supplier's own product are charging no more than the price they have represented as being competitively necessary and as re-*

*quiring* wholesale price support. The supplier must ascertain the prices charged by competing retailers to insure that his dealer's view of the prevailing price competition is accurate. *He must ascertain the price actually charged by his own retailer after support is granted to insure that the dealer is not pocketing the price support instead of passing it on to consumers through lower retail prices which presumably would mean more effective retail price competition and increased demand reflected at the wholesale level.*

464 F.2d at 40 (*Emphasis added*).

These are precisely the interests which the defendant in the present case sought to protect by conditioning the TCA allowance on a companion reduction by the independent dealer in his retail price. There was no evidence adduced at trial to suggest that the TCA program, "benign on its face", was tainted by other affirmative coercive or unfair practices of the defendant. Given the then existing market conditions, the defendant's price reductions at its company-owned stations cannot be characterized as predatory, coercive, or unfair, and hence, they clearly do not detract in any way from the legality of the TCA program as operated by the defendant.[9]

Plaintiff relies on the case of *Pearl Brewing Co. v. Anheuser-Busch,* 1972 Trade Cases ¶ 73,852 (S.D.Tex.). Therein, the court stated:

> It is obvious that the combined thrust of [the] key decisions is that the resaler or wholesaler must be free to make his own independent pricing determination and that any trespass on his independence is violative of section 1 of the Sherman Act, whether the conduct is characterized as a contract combination or conspiracy. It follows from such a premise that a practice of conditioning a price reduction on the acquiescence or cooperation of the recipient to reduce its price can only be viewed as imposing restrictions on the reseller's freedom of decision and, as such, is an unlawful price fixing combination. Such a practice, while admittedly less exacting than the provisions of a formal contract, may, nevertheless, employ other means to a sufficiently higher degree that acceptance by the reseller is effected.

*Pearl Brewing Co. v. Anheuser-Busch,* 1972 Trade Cases at 91,582.

This statement, if taken out of context, is simply too broad a reading of the relevant case law. If it is supportable at all, it is supportable only where evidence demonstrates that the *intent* of the seller is to secure a price reduction to an *artificial* level for the purpose of increasing its penetration of the relevant market. Indeed, the *Pearl* court itself, in discussing *Sun Oil v. FTC, supra,* recognized that a discount given by a supplier to a retailer because "it was aware of the existing competitive factors in the marketplace [which would force the retailer] to reduce the price to consumers in order to meet the competitive need" would not constitute an unlawful price fixing agreement. *Pearl Brewing Co. v. Anheuser-Busch,* 1972 Trade Cases at 19,581.

The holding in *Pearl* was clearly premised on certain factors *not* in evidence in this case, to wit: that the price reductions were not in response to competitive market factors but were rather "a mere tool for market penetration to secure additional sales, and not as a method to meet competition in the marketplace," 1972 Trade Cases at 91,-583, and that the price reductions were at an "artificial" level. In contrast, the evidence in the instant case clearly demonstrates that the TCA program was instituted in response to market forces and resulted in a price level wholly reflective of existing conditions. It was the testimony of all of the Standard Oil employees called by the plaintiff that the sole purpose of the TCA

---

**9.** For additional authority upholding the validity of similar programs, absent "affirmative steps of a coercive nature to bring about the fixing of retail prices", *see Gray v. Shell Oil Co.,* 469 F.2d 742, 747 n. 3 (9th Cir.), *cert.* denied, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1972); *Swettlen v. Wagoner Gas & Oil, Inc.,* 373 F.Supp. 1022 (W.D.Pa.1974), *aff'd* 511 F.2d 1395 (3d Cir. 1975).

program was market maintenance, not market penetration. For these reasons, the Court finds *Pearl Brewing* wholly inapposite.

Presumably, plaintiff would have had the defendant reduce the tank wagon price to its independent dealers by the full amount of any pump price reduction such dealers might choose to make, thus having Standard Oil absorb the full impact of the market forces which necessitated the price cuts while allowing the plaintiff and other independent dealers to maintain their normal profit margin. The Court can find nothing in either law or logic to commend this scheme to the defendant. The plaintiff and the defendant were independent business entities, and the mere fact that the defendant has greater assets than the plaintiff imposes upon it no obligation to carry the plaintiff through adverse economic conditions which the defendant neither generated nor aggravated. The defendant did voluntarily carry 70 percent of the burden, and this Court will not infer an antitrust violation from its refusal to bear more.

For the reasons stated above, the Court finds that the plaintiff has failed to present sufficient evidence from which reasonable men could find an agreement to fix prices. Nor has plaintiff submitted evidence sufficient to establish that defendant's conduct amounted to an "unreasonable restraint of trade." Accordingly, a directed verdict will be entered in favor of the defendant on Counts I and II of plaintiff's Complaint.

## IV.

Count III of plaintiff's Complaint alleges that the defendant Standard Oil is guilty of illegal monopolization and an attempt to monopolize, both in violation of § 2 of the Sherman Act.

## A.

■ To show a monopoly under § 2 of the Sherman Act, two elements must be established: 1) possession of monopoly power in the relevant market; and 2) wilful acquisition or maintenance of that power. *United States v. Grinnel Corp.,* 384 U.S.

563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Monopoly power is defined as "the power to control prices or exclude competition." *United States v. E. I. duPont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). The existence of such power is typically inferred from the situation where a party is shown to control a predominant share of the relevant market. *United States v. Grinnel Corp.,* 384 U.S. at 571, 86 S.Ct. 1698.

Although the market which the defendant is alleged to have monopolized was never clearly delineated by plaintiff's evidence, the Court will assume the relevant product line to be refined gasoline and will further assume the relevant geographical market to be East Toledo, Ohio.

■ As to this market, plaintiff introduced absolutely no evidence as to the market share held by Standard Oil. Mr. Robert Griffin, an executive officer of Standard Oil, did testify that Standard Oil held 33 percent of the Ohio retail gasoline market in 1968, and that its share had decreased to 22 percent in 1976. However, even assuming Sohio held ⅓ of the East Toledo gasoline market, this proof would be insufficient to sustain a charge of monopolization. The controlling case law clearly indicates that control of less than 50 percent of the relevant market is by itself sufficient evidence that monopoly power does *not* exist. *United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295, 346 (D.Mass.1953), *aff'd per curiam,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954); *Hiland Dairy, Inc. v. Kroger Co.,* 402 F.2d 968 (8th Cir. 1968), *cert. denied,* 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969). *See also United States v. E. I. duPont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1965); *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835 (5th Cir. 1975); *Bendix Corp. v. Balax, Inc.,* 471 F.2d 149 (7th Cir. 1972); *Affiliated Music Enterprises, Inc. v. Sesac, Inc.,* 160 F.Supp. 865 (S.D.N.Y.1958), *aff'd* 268 F.2d 13 (2d Cir.), *cert. denied,* 361 U.S. 831, 80 S.Ct. 82, 4 L.Ed.2d 74 (1959); *Jack Winters, Inc. v. Koratron Co.,* 375 F.Supp. 1 (N.D. Cal.1974).

■ The burden of proof as to the relevant market and the defendant's illegal domination of it rests fully on the plaintiff. *Acme Precision Products, Inc. v. American Alloys Corp.,* 484 F.2d 1237, 1249 (8th Cir. 1973), *citing Walker Process Equipment v. Food Machinery Chemical Corp.,* 382 U.S. 172, 177–78, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). *See also Morton Bldgs. of Nebraska, Inc. v. Morton Bldgs., Inc.,* 531 F.2d 910 (8th Cir. 1976). The plaintiff in the present case has clearly failed to meet this burden, and the defendant is accordingly entitled to a directed verdict on plaintiff's claim of illegal monopolization.[10]

### B.

■ Of course by definition an *attempt* to monopolize pertains to an unsuccessful monopolist, so the mere fact that plaintiff failed to show that the defendant possessed monopoly power in the relevant market does not dispose of plaintiff's claim of attempted monopoly. However, to prove an attempt to monopolize under § 2 of the Sherman Act, plaintiff must show that the defendant has both the power to monopolize[11] and the specific intent to monopolize.[12] Moreover, in order constitute a violation of § 2, the attempt must pose a "dangerous probability" that a monopoly could be established. *American Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *United States v. Aluminum Co. of Am.,* 148 F.2d 416, 431 (2d Cir. 1945); *TV Signal Co. of Aberdeen v. Am. Telephone & Telegraph Co.,* 462 F.2d 1256 (8th Cir. 1972); *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338 (3d Cir. 1975).

■ Although there is some conflict among the circuits as to whether proof of the relevant market structure is required to maintain a claim for attempted monopoly,[13] the Court finds that such proof is critical in a case such as this. Certainly the trier of fact cannot determine whether or not there existed a "dangerous probability" of monopolization without being presented with evidence of the overall structure of the market, including the number and size of the defendant's competitors and the relative share of the market controlled by each. *See Walker Process Equipment, Inc. v. Food Machinery,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338 (3d Cir. 1975); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547 (1st Cir. 1974); *Acme Precision Products, Inc. v. American Alloys Corp.,* 484 F.2d 1237 (8th Cir. 1973). Yet plaintiff presented no evi-

10. The plaintiff has attempted to rely upon a Consent Decree entered in the case of *United States v. Standard Oil of Ohio,* C 69–954 (N.D. Ohio, filed January 1, 1970), as proof of his claims under § 2 of the Sherman Act. The Court would simply note that said judgment was entered "before the taking of testimony and without trial or adjudication of any issue of fact or law herein and without this Final Judgment constituting any evidence or admission by any party hereto with respect to any issue." Accordingly, no precedential value whatsoever may be attached to that decree.

11. *Swift & Co. v. United States,* 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905); *American Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Kansas City Star Co. v. United States,* 240 F.2d 643 (8th Cir.), *cert. denied,* 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957); *Agrashell v. Hammons Products Co.,* 479 F.2d 269 (8th Cir.), *cert. denied,* 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973); *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing,* 510 F.2d 1140 (2d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct.

2416, 44 L.Ed.2d 679 (1975); *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338 (3d Cir. 1975).

12. *United States v. Griffith,* 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); *Times-Picayune v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *Agrashell, Inc. v. Hammons Products Co.,* 479 F.2d 269 (8th Cir. 1973); *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.,* 497 F.2d 203 (9th Cir. 1974); *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338 (3d Cir. 1975).

13. Only the Ninth Circuit has persisted in the notion that the relevant market need not be shown to establish a claim for attempted monopoly. *Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9th Cir. 1964); *Industrial Bldg. Materials, Inc. v. Interchemical Corp.,* 437 F.2d 1336 (9th Cir. 1970). For a discussion of the uncertainty in the courts regarding the Ninth Circuit's position, *see General Communications Engineering, Inc. v. Motorola Communications & Electronics, Inc.,* 421 F.Supp. 274 (N.D.Cal.1976).

dence whatsoever on this question.[14] He did, however, introduce into evidence several exhibits which reveal numerous competitors in the East Toledo retail gasoline market during the relevant period, including most major oil companies and numerous private branders.

In *Hudson Valley Asbestos Corp. v. Tougher Heating and Plumbing,* 510 F.2d 1140 (2d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975), the evidence similarly demonstrated that the defendant had several "vigorous competitors." In ruling on the plaintiff's allegations of an attempt to monopolize, the Second Circuit Court of Appeals stated:

> * * * it is patently obvious that the defendants had no power to control [the relevant] market. Although specific intent to monopolize, and not monopoly power, is the essential element when a conspiracy to monopolize is involved [citations omitted] the absence of any likelihood of success is certainly some evidence on the question of whether such specific intent existed. And here the futility of any effort to monopolize either [market] as shown by the evidence, * * * coupled with the repeated denials of the defendants [of any intent to monopolize] amply support the finding of the district court [in favor of the defendant].

*Hudson Valley Asbestos Corp. v. Tougher Heating and Plumbing,* 510 F.2d at 1144. *See also Agrashell, Inc. v. Hammons Products Co.,* 479 F.2d 269 (8th Cir. 1973).

The Court finds the statement fully applicable to the instant case, and accordingly will order a directed verdict in favor of the defendant on all claims stated in Count III of the Complaint.

## V.

Count IV of plaintiff's Complaint alleges that the defendant has discriminated in price between the plaintiff and other independent Sohio dealers "in the southeastern area of Lucas County" in contravention of the Robinson-Patman Act.

The Robinson-Patman Act, which amended § 2 of the Clayton Act (codified at 15 U.S.C. § 2), provides, *inter alia* :

> (a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of like grade and quality, *where either or any of the purchases involved in such discrimination are in commerce, * * *. (Emphasis added.)*

As construed by the courts, this section states three threshold jurisdictional requirements for establishment of a Robinson-Patman violation:

> 1) the seller must engage in interstate commerce;

> 2) the challenged discrimination must be committed "in the course of interstate commerce", and

> 3) at least one of the alleged discriminatory sales must occur in interstate commerce.

4 Von Kalinowski, Antitrust Laws and Trade Regulation, § 26.01[1], 26–4. *Littlejohn v. Shell Oil Co.,* 483 F.2d 1140 (5th Cir. 1973); *Belliston v. Texaco, Inc.,* 455 F.2d 175 (10th Cir. 1972).

The defendant asserts, and the Court must agree, that the plaintiff's evidence fails to establish that even one of the al-

---

**14.** The plaintiff contends that his burden of showing a "dangerous probability" of monopolization was satisfied by the testimony of an expert witness, Economics Professor Henry Rennie. In response to a hypothetical situation posed by plaintiff's counsel, Dr. Rennie testified that it was his opinion, expressed with "reasonable economic certainty", that if you assumed the defendant held 28 percent of the market, and then experienced an increase in gallonage sold of 3½ percent, this would tend toward monopoly. However, this opinion establishes nothing with respect to the instant case for two reasons. First, it assumes facts about Sohio's position in the East Toledo market not established by the plaintiff's evidence. More importantly, it fails to take account of other critical variables, namely the number and size of the defendant's competitors, and the relationship between defendant's increase in gallonage and its share of the market. Expert testimony given without reference to the facts in evidence is clearly insufficient to sustain plaintiff's burden of proof.

leged discriminatory sales occurred in interstate commerce.

By the plain language of Count IV of his Complaint, the plaintiff has alleged discrimination by the defendant Standard Oil *only* with respect to sales made by the defendant to plaintiff and its other independent dealers operating *within the southeastern area of Lucas County, Ohio.* There was no evidence presented at trial which would extend the scope of this allegation to include transactions crossing state lines. Hence, while the defendant's allegedly discriminatory sales may very well have "affected" interstate commerce, they were not "in commerce" as required by the Robinson-Patman Act.

This distinction is well demonstrated by the opinion of the Sixth Circuit Court of Appeals in *Willard Dairy Corp. v. Nat'l Dairy Products Corp.,* 309 F.2d 943 (6th Cir. 1962), *cert. denied,* 373 U.S. 934, 83 S.Ct. 1554, 10 L.Ed.2d 691 (1963). Therein, the plaintiff alleged that the defendant had made discriminatory sales of milk from its plant in Shelby, Ohio. All sales were made to retailers within Ohio. While it was conceded that the defendant was engaged in interstate commerce, the Sixth Circuit affirmed the district court's order awarding the defendant summary judgment for the reason that the alleged sales were not "in commerce."

> In the present case there is no question but that the defendant was engaged in commerce, but it is contended that the discriminating sales complained of were not made 'in the course of such commerce' and therefore were not in violation of the Act. The authorities appear to hold that it is not enough under the Clayton Act, as amended by the Robinson-Patman Act, that the defendant be engaged in interstate commerce but it must also be shown that the sale complained of was one occurring in interstate

commerce. [citations omitted] * * * The cases recognize a distinction between the commerce which is covered by the Sherman Act and that covered by the Robinson-Patman Act. 'In an action brought under the Robinson-Patman Act it is necessary to allege and prove that the transactions complained of are actually in interstate commerce, while in actions brought under the Sherman Anti-Trust Act it is sufficient if the transactions complained of are shown to have affected interstate commerce.' * * * Accordingly, cases involving liability under the Sherman Anti-Trust Act where it was sufficient to show that the sales *affected* interstate commerce are not applicable to our present case.

> In the present case, the price discrimination relied upon was by reason of sales in the area of competition and sales in and around the City of Marion, Ohio. These sales by the defendant were from defendant's processing plant in Shelby, Ohio, and were purely intrastate transactions, not interstate in character, as is necessary to impose liability under the Robinson-Patman Act. The fact that defendant also made interstate shipments from other than its Shelby, Ohio, plant to areas in which the plaintiff did not engage in business is immaterial to the issue in this case. *Davidson v. Kansas City Star Company,* 202 F.Supp. 613, 618–619, W.D.Mo.

309 F.2d at 946. *Accord, Belliston v. Texaco, Inc.,* 455 F.2d 175 (10th Cir. 1972); *Hiram Walker, Inc. v. A & S Tropical, Inc.,* 407 F.2d 4 (5th Cir. 1969); *Borden Co. v. FTC,* 339 F.2d 953 (7th Cir. 1964); *Cream Crest-Blanding Dairies v. National Dairy Products Corp.,* 243 F.Supp. 331 (W.D.Mich. 1965), *aff'd per curiam,* 370 F.2d 332 (6th Cir. 1967). *Cf. Standard Oil v. FTC,* 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1951).[15]

It might be argued that *Willard, supra,* is distinguishable from the instant

---

15. The notion that the interstate commerce requirement of the Robinson-Patman Act is far more stringent than that of the Sherman Act has recently been reaffirmed by the Supreme Court in *Gulf Oil Corp. v. Copp Paving Co.,* 419

U.S. 186, 194–95, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974).

> The explicit reach of [the Robinson-Patman Act] extends only to persons and activities that are themselves 'in commerce,' the term

case because there the milk was purchased, processed and sold by the defendant entirely within the state of Ohio, whereas the evidence in the present case shows that defendant Standard Oil transports crude oil into Ohio from other states for refinement into gasoline which is then sold to independent dealers such as the plaintiff. However, courts which have faced this question have uniformly rejected the notion that the "in commerce" requirement of the Robinson Patman Act is satisfied by the mere fact that gasoline sold in one state was refined from crude oil imported from other states. As noted by the Tenth Circuit Court of Appeals in *Belliston v. Texaco, Inc.*, 455 F.2d 175, 180 (10th Cir. 1972),

> [t]he production of gasoline from crude oil is a highly complex process requiring expensive, precision equipment and skilled technicians * * *. [Thus] when crude oil is refined into gasoline, the character of these products is so changed that they cannot be equated as

the 'same stuff' to satisfy the requirements of the 'flow of commerce' theory. *Accord, Mailand v. Powerine Oil Co.*, 1973 Trade Cases ¶ 74,472 (C.D.Cal.); *Izumi v. Shell Oil Co.*, 1973 Trade Cases ¶ 74,274 (N.D.Cal.1972); *Myers v. Shell Oil Co.*, 96 F.Supp. 670 (S.D.Cal.1951); *Lewis v. Shell Oil Co.*, 50 F.Supp. 547 (N.D.Ill.1943). See also *Baldwin Hills Building Material Co. v. Fiberboard Paper Products Corp.*, 283 F.Supp. 202 (C.D.Cal.1968). *Contrast Standard Oil v. FTC*, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1951); *Bargain Car Wash, Inc. v. Standard Oil Co.*, 1972 Trade Cases ¶ 74,121 (7th Cir. 1972).

The foregoing authority clearly controls the instant case.[16] The plaintiff having failed to present evidence demonstrating that any one of the alleged discriminatory sales occurred in interstate commerce, it is the finding of the court that the plaintiff has failed to establish the threshold requirement for maintenance of an action under the Robinson-Patman Act.[17]

'commerce' being defined in § 1 of the Clayton Act, insofar as relevant here, as 'trade or commerce among the several States and with foreign nations * * *.' 15 U.S.C. § 12. This 'in commerce' language differs distinctly from that of § 1 of the Sherman Act, which includes within its scope all prohibited conduct 'in restraint of trade or commerce among the several States, or with foreign nations * * *.' The jurisdictional reach of § 1 thus is keyed directly to efforts on interstate markets and the interstate flow of goods * * *.

In contrast to § 1, the distinct 'in commerce' language of the Clayton and Robinson-Patman Act provisions with which we are concerned here appears to denote only persons or activities within the flow of interstate commerce—the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer. If this is so, the jurisdictional requirements of these provisions cannot be satisfied merely by showing that allegedly anti-competitive acquisitions and activities *affect* commerce.

16. The plaintiff has attempted to rely upon the "interstate beneficiary" theory advanced in *Moore v. Mead's Fine Bread Co.*, 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954), to discount the purely intrastate character of the transactions involved in this case. Plaintiff suggests that *Moore* stands for the proposition that the

Robinson-Patman Act does reach purely intrastate price discrimination where it is shown that the seller has used interstate transactions to underwrite price cutting in intrastate sales. In response, the Court would first note that *Moore* involved a scheme of price maintenance in interstate sales accompanied by price cutting in intrastate sales resulting in what has been termed "interstate price discrimination"—a fact pattern not in evidence in this case. See *Littlejohn v. Shell Oil Co.*, 483 F.2d 1140 (5th Cir. 1973), *vacating* 456 F.2d 225 (5th Cir. 1972); *Izumi v. Shell Oil Co.*, 1973 Trade Cases ¶ 74,274, *supra*. "Moreover, the Supreme Court has refused certiorari in subsequent cases wherein *Moore* was interpreted as requiring interstate discriminatory sales for a Robinson-Patman Act violation. E. g., *Willard Dairy Corp. v. Nat'l Dairy Products Corp.*, 309 F.2d 943 (6th Cir. 1962), cert. denied, 373 U.S. 934, 83 S.Ct. 1554, 10 L.Ed.2d 691 (1963); *Jones v. Metzger Dairies, Inc.*, 334 F.2d 919 (5th Cir. 1964), *cert. denied*, 379 U.S. 965, 85 S.Ct. 659, 13 L.Ed.2d 559 (1965)." *Izumi v. Shell Oil Co.*, 1973 Trade Cases ¶ 74,274 (N.D.Cal.1973).

17. Even assuming the jurisdictional requirement of the Robinson-Patman Act to have been met in this case, the Court would nonetheless be inclined to severely limit the scope of Count IV of the plaintiff's Complaint. Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, requires that there be sales to two

The defendant is therefore entitled to a directed verdict on Count IV of the complaint as well.

For the reasons stated above, it is

ORDERED that the plaintiff's motion for a directed verdict should be and hereby is denied.

IT IS FURTHER ORDERED that defendant's motion for a directed verdict should be and hereby is granted.

*different purchasers.* The evidence adduced at trial shows that the defendant sold wholesale to (a) independent Sohio dealers (such as the plaintiff), and (b) certain off-brand dealers (such sales comprised only approximately 1 percent of all Sohio sales, and the plaintiff has made no allegations of price discrimination regarding these purchases). Standard Oil also sells directly to consumers at the retail level through its company-owned stations. However, it is clear that the Sohio company-owned stations were not "purchasers" within the meaning of § 2(a), as such stations did not "buy" from Standard Oil.

The facts clearly disclose that the company-owned stations were mere sales subsidiaries. Although the court was not forced to decide the question, the Sixth Circuit Court of Appeals did, in strong dicta in *Brewer v. Uniroyal, Inc.,* 498 F.2d 973 (6th Cir. 1974), discuss the theory that a wholly-owned subsidiary will be considered an entity separate from its parent and thus considered a purchaser or customer for purposes of the Robinson-Patman Act. The court stated:

> We agree that a sales subsidiary could be found to be independent of its parent and thus be considered a "purchaser" or "customer" under the Act. *Reines Distributors, Inc. v. Admiral Corp.,* 257 F.Supp. 619, 621 (S.D.N.Y.1965). But it has been held that in determining whether a seller-purchaser relationship exists, the critical factor is the exercise of domain and control over the subsidiary by the parent, not the competitive relationship. *Reines Distributors, Inc. v. Admiral Corp.,* 256 F.Supp. 581 (S.D.N.Y.1966); *Baim & Blank, Inc. v. Philco Corp.,* 148 F.Supp. 541 (E.D.N.Y.1957). This standard is used in determining whether a parent and its subsidiary are a single entity and can be considered a single seller under the Robinson-Patman Act, *Baim & Black, Inc. v. Philco Corp.,* 148 F.Supp. 541 (E.D.N.Y.1957), and in determining whether a buyer from a distributor is an "indirect purchaser" from the supplier of the distributor. *Purolator Products, Inc. v. F. T. C.,* 352 F.2d 874 (7th Cir. 1965), cert. denied 389 U.S. 1045, 88 S.Ct. 758, 19 L.Ed.2d 837; *see* 3 Von Kalinowski, Antitrust Laws and Trade Regulation §§ 24.-03 and 24.04; F. Rowe, Price Discrimination Under the Robinson-Patman Act 53–59 (1962) & Supp. 7–8 (1964). Thus, the courts

which have ruled on the question have found it appropriate that the same standard be applied to determine whether a sales subsidiary can be deemed a purchaser from its parent. *See* Von Kalinowski, *supra,* § 24.04[2]–[3]. There appears to be general agreement that there can be no sale under the Act unless the parties deal at arm's length, *Reines Distributors, Inc. v. Admiral Corp.,* 256 F.Supp. 581, 585–586 (S.D.N.Y.1966), and authorities cited therein, although the argument has been advanced that the realistic effect on competition, rather than the question of control, should be the standard. *Id.* In view of our holding, however, we need not decide this question.

498 F.2d at 977 n. 2.

Applying this standard, the company-owned Sohio stations were clearly not "different purchasers" within the meaning of § 2(a) of the Clayton Act, as amended by the Robinson-Patman Act.

The various independent dealers to whom the defendant sold gasoline were of course "different purchasers." And it was certainly true that the price received by Sohio from those several purchasers varied from time to time according to their respective acceptance or rejection of the TCA. But the mere fact that a seller's pricing policies encompasses the use of discounts, or allowances, does *not* necessarily mean that he is engaging in actionable price discrimination. A seller may offer discounts, allowances, etcetera, *provided* he makes the same offer to all purchasers. If a seller *offers* the same price to all customers, there is *no* actionable price discrimination *despite* the fact that a buyer fails to take advantage of any allowance that has been practically available to him. 4 Von Kalinowski, Antitrust Laws and Trade Regulation, § 27.04.

The evidence adduced in the present case shows that during most of the time frame covered by the plaintiff's Complaint, the TCA was offered to all independent dealers in the relevant market under precisely the same terms. Only during the very early period of the program did the defendant limit its availability to certain dealers. Accordingly, plaintiff's recovery would necessarily be limited to that time frame, and only damages shown to have resulted from that limited period of price discrimination would be considered.